UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ENERGOINVEST DD, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| DEMOCRATIC REPUBLIC | ) |
| OF CONGO and SOCIETE NATIONALE | ) |
| D'ELECTRICITE (S.N.E.L.), | ) |
| | ) |
| Respondents. | ) |

CIV. _____ (   )

## AFFIDAVIT OF PETER R. GRIFFIN

I, Peter R. Griffin, pursuant to 28 U.S.C. § 1746, hereby certify under penalty of perjury as follows:

1.     I am a Partner of the law firm of Shearman & Sterling LLP. I represented Energoinvest in the arbitration proceedings before the International Court of Arbitration in Docket No. 11442.

2.     The attached copy of the "Award" of the International Court of Arbitration is an accurate, true and correct reproduction of the original Award issued by that body in Docket No. 11442.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 16th day of June, 2003.

(signature)

FILED

JUN 1 7 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

03 1315



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** • **Cour internationale d'arbitrage**

# AWARD
# SENTENCE

## COUR INTERNATIONALE D'ARBITRAGE

### AFFAIRE No. 11442/KGA

### ENERGOINVEST DD

### (Bosnie-Herzegovine)

*c/*

## 1. REPUBLIQUE DEMOCRATIQUE DU CONGO
### (Précédemment République du Zaïre)

### (Rép. Dem. du Congo)

## 2. SOCIETE NATIONALE D'ELECTRICITE (S.N.EL)

### (Rép. Dem. du Congo)

Ce document est un original de la sentence rendue conformément au Règlement de la Cour Internationale d'Arbitrage de la CCI.

# COUR INTERNATIONALE D'ARBITRAGE
## DE LA
## CHAMBRE DE COMMERCE
## INTERNATIONALE

### AFFAIRE N° 11442/KGA

**ENERGOINVEST DD**
Hamdije Cemerlica 2, 71000 Sarajevo (Bosnie-Herzégovine)
représentée par Mes Brenno Brunoni et Andrea Molino, « Spiess Brunoni
Pedrazzini Molino », Via Pioda 14, CH 6900 Lugano (Suisse), ainsi que par
Mes. Danforth Newcombe, Peter Griffin et Barbara Diggs, « Shearman &
Sterling », 114, Av. des Champs-Elysées, F 75008 Paris (France)

- **Demanderesse** -

c o n t r e

**1. REPUBLIQUE DEMOCRATIQUE DU CONGO**
(anciennement République du Zaïre)
en la personne de S.E. le Ministre de Justice et Garde des Sceaux de la
République Démocratique du Congo, Palais de Justice, Place de
l'Indépendence, Kinshasa-Gombe (République Démocratique du Congo), non-
comparante

- **Défenderesse N°1** -

et

**2. SOCIETE NATIONALE D'ELECTRICITE (S.N.EL.)**
2831 Avenue de la Justice, Kinshasa-Gombe (République Démocratique du
Congo)
représentée par Mes. Daniel Fauquet et Didier Joseph, « CSM Bureau Francis
Lefebvre » 1-3 Villa Emile Bergerat, F 92522 Neuilly-sur-Seine, Cedex Paris
(France)

- **Défenderesse N°2** -

# SENTENCE   FINALE

# Table des Matières

| | | |
|---|---|---|
| I. | Les Faits | 3 |
| II. | La Procédure Arbitrale | 6 |
| III. | Les Parties | 17 |
| | A. Energoinvest | 17 |
| | B. La République Démocratique du Congo | 18 |
| | C. La Société Nationale d'Electricité | 19 |
| IV. | Juridiction du Tribunal Arbitral | 20 |
| V. | Droit de la Demanderesse au paiement des somme réclamées | 26 |
| VI. | Engagement de la RDC | 30 |
| VII. | Engagement de la S.N.EL | 31 |
| VIII. | Solidarité | 39 |
| IX. | Demande de paiement des intérêts | 42 |
| X. | Frais de l'arbitrage | 43 |

# I  - LES FAITS

1. En date 8 février 1986, un contrat a été signé entre la République du Zaïre (aujourd'hui dénommée République Démocratique du Congo) et la société yougoslave ENERGOINVEST pour la réalisation de l'aménagement hydroélectrique sur l'Ubangi, à Mobayi ( projet *« Mobayi »*). Ce contrat portait sur les études, la fourniture, l'installation et la mise en service :

- des équipements hydro-mécaniques, mécaniques et électriques de la centrale (à l'exception des groupes turbo-alternateurs);
- d'une ligne de 30 KV assurant les liaisons vers les sous-stations à Gbadolite, à la Présidence et à l'Aéroport;
- desdites sous-stations;
- de la distribution en 6,6 KV dans la ville de Gbadolite.

2. A la première page de ce contrat, la partie zaïroise au contrat était désignée comme suit: *« La République du Zaïre, Maître de l'Ouvrage, dûment représentée par la SOCIETE NATIONALE D'ELECTRICITE, en abrégé SNEL [...] ci-après désignée par SNEL ou MAÎTRE D'OEUVRE [...] »*
La société ENERGOINVEST y est désignée comme *« LE CONTRACTANT »*.
Toutefois, à la page 2 du contrat, la S.N.EL est mentionnée comme étant *« l'instrument d'exécution du Maître de l'Ouvrage »* et à l'article 2, ayant pour objet les *« Définitions »*, le contrat est défini de la manière suivante :
*« Contrat désigne le présent contrat conclu entre le MAÎTRE D'ŒUVRE et le CONTRACTANT, y compris les annexes. »*

3. La valeur totale du contrat, pour la partie en US$, est indiquée pour un montant de US$ 18,000,000.-, des variations restant possibles par l'effet de modifications aux fournitures, de différences dans les quantités, ainsi que par effet de l'application de la formule de révision des prix.

En effet, le contrat du 8 février 1986 apparaît avoir été modifié et complété par plusieurs avenants dans les années suivantes.

4. Les conditions de paiement du contrat prévoient que 15% soient payés à titre d'acompte dans les 30 jours de la signature du contrat et que 85% soient payés par imputation à un crédit que l'on dit « accordé », mais dont en réalité l'Accord n'a été signé qu'un mois plus tard.

5. L'Accord de Crédit pour le projet « *Mobayi* » porte la date du 4 mars 1986 et il est conclu entre la République du Zaïre et la Société Nationale d'Electricité, la S.N.EL, d'une part et la société ENERGOINVEST Ro Energokomerc, pour le compte de la Ro Energoinzenjering, d'autre part.
Puisque la Ro Energocomerc et la Ro Energoinzenjering ont été ensuite absorbées par la société ENERGOINVEST, la partie yougoslave aux différents contrats, y compris l'Accord de Crédit, est désignée dans cette sentence seulement sous le nom d'ENERGOINVEST .

6. L'Accord de Crédit « [...] *porte sur une opération commerciale et financière dont le montant total est de 26,500,000 US$* » (article 2.1).

7. Le crédit est accordé pour une durée de 10 ans au taux d'intérêt de 8,75% par an (article 2.2).

8. Le « Prêteur » (soit ENERGOINVEST) s'engage à financer 85% de la valeur totale des études, fournitures et services nécessaires à la réalisation du projet, soit US$ 22,525,000 (article 2.3).

9. Le préambule de l'Accord indique que : « *La République du Zaïre a mandaté la Société Nationale d'Electricité, la S.N.EL. à l'effet de procéder à l'aménagement hydroélectrique de Mobayi et de conclure avec les différentes*

*parties intervenantes les contrats permettant de mener à bonne fin l'exécution dudit mandat. »*

10. Conformément audit préambule, l'article 3.1 de l'Accord dispose que *« pour la réalisation des investissements prévus »* la S.N.EL *« devra conclure des contrats commerciaux avec ENERGOINVEST. »*

11. Les *« Conditions de Financement »* sont réglées en détail dans l'Accord (article 5) et elles prévoient en particulier que pour le remboursement du crédit le prêteur émettra des traites en capital et en intérêts, qui seront *« tirées sur la S.N.EL »* et *« avalisées par le Commissaire d'Etat ayant les Finances dans ses attributions. »*

12. Il est aussi prévu (article 5.6) que *« L'Emprunteur obtiendra en faveur du Prêteur une ordonnance octroyant la garantie de l'Etat zaïrois au présent Accord de Crédit, selon une forme acceptable par le Prêteur. »*

13. L'Accord de Crédit est signé *« Pour le PRÊTEUR »* par ENERGOINVEST et *« Pour l'EMPRUNTEUR »* par le Commissaire d'Etat aux Finances et Budget (représentant de la République du Zaïre) ainsi que par la S.N.EL.

14. La ratification de l'Accord de Crédit a été autorisée par l'Ordonnance-Loi n°86-038 de la République du Zaïre du 5 avril 1986 et elle est intervenue à la même date par acte du Président de la République.

15. Les traites destinées à la couverture du financement, comme prévu dans l'Accord de Crédit, ont été régulièrement émises par ENERGOINVEST, acceptées par la S.N.EL et avalisées par le Commissaire d'Etat aux Finances et Budget au nom de la République du Zaïre.

16. Le total des traites pour le capital se chiffre à US$ 15,300,000 et le total des traites pour les intérêts contractuels se chiffre à US$ 7,026,408.53.

17. Suite au défaut d'exécution du remboursement du prêt dans les termes convenus, en date du 2 mars 2001 ENERGOINVEST a introduit une Demande d'Arbitrage contre la République Démocratique du Congo et contre la S.N.EL. Cette Demande fait référence non seulement à l'Accord de Crédit, mais également à une lettre du Ministre des Finances de la République du Zaïre du 4 mars 1991 qui reconnaît la dette envers ENERGOINVEST.

18. Malgré la défaillance des débiteurs, l'ouvrage a été réalisé par ENERGOINVEST et n'a fait l'objet d'aucune réclamation de la part de l'Etat zaïrois et/ou de la S.N.EL.

## II - LA PROCEDURE D'ARBITRAGE

19. Le 4 mars 2001, la société ENERGOINVEST (ci-après « Energoinvest » ou « Demanderesse ») a introduit une Demande d'Arbitrage auprès de la Cour Internationale d'Arbitrage de la Chambre de Commerce Internationale contre la République Démocratique du Congo (ci-après « RDC » ou « Défenderesse n°1 ») et la Société Nationale d'Electricité de la République Démocratique du Congo (ci-après « S.N.EL » ou « Défenderesse n°2 »).

20. La Demande d'Arbitrage était basée sur l'Accord de Crédit du 4 mars 1986 et sur la reconnaissance du Ministère des Finances de la République du Zaïre dans une lettre du 4 mars 1991. Elle était accompagnée par un dossier comprenant sept documents et les conclusions de la Demanderesse étaient que les deux Défenderesses soient conjointement et solidairement condamnées au paiement en sa faveur de la somme de US$ 18,073,746.78 plus les intérêts au taux contractuel de 8,75% par an, à compter de la date de chaque échéance en

souffrance, ainsi qu'au paiement des frais d'arbitrage, y inclus les frais de sa
défense.

21. La clause d'arbitrage invoquée par la Demanderesse était celle qui se
trouve à l'article 7 de l'Accord de Crédit et qui est formulée de la manière
suivante :

*« Tout différend ou litige pouvant découler du présent Accord de Crédit sera
préalablement soumis à un règlement amiable entre les parties.*

*Les différends découlant de l'interprétation ou de l'application du présent
Accord de Crédit seront tranchés définitivement suivant le Règlement de
conciliation et d'arbitrage de la Chambre de Commerce Internationale de
Paris par le Conseil d'arbitres nommés conformément à ce Règlement.*

*Le lieu d'arbitrage sera Paris (France) et l'arbitre appliquera la loi suisse. »*

22. La Demanderesse mentionnait dans sa demande qu'un contrat similaire
entre les mêmes parties avait été signé le 2 avril 1980 pour le financement d'un
autre projet hydro-électrique (un projet nommé « *Katana-Goma* ») et que les
Défenderesses étaient également défaillantes par rapport à ce deuxième contrat.
Puisque cette défaillance faisait l'objet d'une procédure d'arbitrage parallèle
mais séparée, enregistrée à la Cour Internationale d'Arbitrage de la CCI sous le
n°11441/KGA, la Demanderesse demandait, en voie préliminaire, la jonction
des deux procédures arbitrales.

23. Aucune des deux Défenderesses n'a répondu à la Demande d'Arbitrage
dans le délai imparti par la Cour conformément au Règlement.

24. Le 7 mai 2001, le Secrétariat de la Cour a informé les parties qu'en
l'absence de soumission d'une Réponse par les Défendeurs dans le délai
imparti, le dossier serait soumis à la Cour lors de l'une de ses prochaines
sessions, afin que celle-ci décide de l'éventuelle mise en route de la procédure

d'arbitrage conformément à l'article 6(2) du Règlement. La même communication attirait l'attention des parties sur l'article 6(3) du Règlement, suivant lequel : « *Si l'une des parties refuse ou s'abstient de participer à l'arbitrage ou à tout stade de celui-ci, l'arbitrage a lieu nonobstant ce refus ou cette abstention.* »

25. Lors de sa session du 18 mai 2001, la Cour Internationale d'Arbitrage a pris les décisions suivantes :

- ne pas joindre cette affaire à l'affaire 11441/KGA;
- mettre en route la procédure conformément à l'article 6(2) du Règlement (tout en estimant possible « *prima facie* » l'existence entre les parties d'une convention d'arbitrage visant le Règlement, sauf au Tribunal de statuer sur sa propre compétence);
- soumettre cette affaire à un Tribunal Arbitral de trois membres ;
- confirmer Me Marc Ronca, du Cabinet d'Avocats Schellenberg Wittmer de Zurich (Suisse), en qualité de co-arbitre sur proposition de la Demanderesse;
- accorder 15 jours aux Défenderesses pour désigner conjointement un co-arbitre, faute de quoi un co-arbitre serait nommé par la Cour en leur lieu et place conformément à l'article 9(6) du Règlement;
- prendre les mesures nécessaires à la désignation du Président du Tribunal Arbitral;
- fixer la provision pour frais de l'arbitrage à US$ 322,000, sous réserve de réajustements ultérieurs, tout en invitant les parties à régler cette provision à raison de US$ 161,000 à la charge de la Demanderesse et US$ 161,000 à la charge des Défenderesses.

26. Par lettre du 1er juin 2001 adressée à la Cour Internationale d'Arbitrage de la CCI et pour information au Ministre de l'Energie de la République Démocratique du Congo et au Conseil de la Demanderesse, la S.N.EL a fait

connaître son souhait de trouver une solution négociée au litige, tout en exprimant l'opinion que la Cour Internationale d'Arbitrage de la CCI ne serait pas compétente pour juger de l'affaire, parce que : *« Le recours au règlement de conciliation et d'arbitrage de la Chambre de Commerce Internationale n'implique pas de plein droit la reconnaissance par les parties de la compétence de la Cour Internationale d'Arbitrage ni l'institution d'un Tribunal Arbitral par ladite Cour. »*

27. Par lettre du 3 août 2001 adressée à la Cour Internationale d'Arbitrage de la CCI et pour connaissance au Conseil de la Demanderesse, le Ministre de Justice et Garde des Sceaux de la République Démocratique du Congo a fait connaître que son Ministère a la compétence pour représenter l'Etat Congolais dans la procédure d'arbitrage et a proposé d'avoir des discussions avec la Demanderesse afin de rechercher un règlement amiable du litige.

28. Par lettre du 31 octobre 2001 la Demanderesse a communiqué à la Cour Internationale d'Arbitrage de la CCI que les négociations en vue d'un accord extrajudiciaire n'avaient pas abouti et a demandé la continuation de la procédure arbitrale.

29. Le 23 novembre 2001, le Secrétariat de la Cour a informé les parties qu'en raison du défaut des Défenderesses de procéder à la nomination conjointe d'un co-arbitre, la Cour avait décidé de nommer Me Mohamed Abu-Samra, de Khartoum (République du Soudan) en qualité de co-arbitre, en leur lieu et place, conformément à l'article 9(6) du Règlement.

30. Le 18 décembre 2001, le Secrétariat de la Cour informait les parties que lors de sa session du 14 décembre 2001, la Cour avait nommé Avv. Renato Roncaglia de Genève (Suisse) en qualité de Président du Tribunal Arbitral, sur proposition du Comité National Italien et que, de telle manière, le Tribunal

Arbitral était entièrement formé et que le dossier de l'affaire lui avait été transmis. Le siège de l'arbitrage était confirmé être Paris (France), conformément au choix des parties dans la clause d'arbitrage.

31. Le 29 janvier 2002, le Tribunal Arbitral a envoyé aux parties un projet d'Acte de Mission, rédigé sur pièces conformément à l'article 18 du Règlement et les a invitées à lui faire parvenir leurs commentaires et suggestions dans un délai de 15 jours.

32. Certains commentaires ont été soumis par la Demanderesse en date du 13 février 2002, tandis que les deux Défenderesses n'ont fait parvenir aucun commentaire au Tribunal Arbitral. Toutefois, le 30 janvier 2002, la S.N.EL adressa une lettre (presque certainement écrite avant la réception du projet d'Acte de Mission) au Tribunal Arbitral. Elle n'y a donné aucune réponse à la Demanderesse sur le fond de l'affaire et s'est limitée à demander encore une fois la jonction de cette procédure à l'autre procédure arbitrale ayant lieu entre les mêmes parties (inscrite à la Cour de la CCI sous le n°11441/KGA), ainsi qu'à souhaiter que des audiences auxquelles les parties puissent participer soient prévues par le Tribunal.

33. Par son Ordre du 21 février 2002, le Tribunal Arbitral a informé les parties qu'il ne lui était pas possible de se prononcer sur la demande de jonction des deux procédures d'arbitrage tant que la Défenderesse n°1 ne déclarait pas son accord à ce sujet et transmettait en même temps aux parties le projet définitif de l'Acte de Mission, les invitant à le signer et à le renvoyer avant le 20 mars 2002.

34. Seule la Demanderesse a signé l'Acte de Mission dans le délai mentionné ci-dessus.

35. Entre-temps, les Défenderesses n'ayant pas payé leur part de la provision pour frais d'arbitrage, la totalité de ladite provision (soit US\$ 322'000) était payée par la Demanderesse, ce dont le Secrétariat de la Cour lui a donné acte dans sa communication du 18 mars 2002.

36. Le 17 avril 2002, l'Acte de Mission signé par la Demanderesse et par le Tribunal Arbitral était transmis à la Cour pour approbation conformément à l'article 18(3) du Règlement.

37. L'Acte de Mission a été approuvé par la Cour lors de sa session du 17 mai 2002 et il a successivement été transmis par le Secrétariat de la Cour aux Défenderesses avec invitation à le signer.

38. Par Ordre du 23 mai 2002, le Tribunal Arbitral a accordé un terme aux parties jusqu'au 28 juin 2002 afin que la Demanderesse puisse préciser sa demande et compléter ses soumissions, ainsi qu'elle l'avait demandé et aussi que les Défenderesses puissent répondre à la Demande d'Arbitrage, ce qu'elles n'avaient pas encore fait. Dans le même Ordre, un terme ultérieur jusqu'au 26 juillet 2002 a été accordé à la Demanderesse pour une éventuelle réplique à la réponse des Défenderesses (si une telle réponse était soumise), et aux Défenderesses jusqu'au 23 août 2002 pour une duplique à l'éventuelle réplique de la Demanderesse. Après quoi, le Tribunal Arbitral s'est réservé de convoquer une audience procédurale à Zurich, afin de donner aux parties l'opportunité de mieux illustrer leurs soumissions respectives et aussi pour décider, après l'audition des parties, de l'éventuelle admission d'autres moyens de preuve ainsi que, de manière plus générale, de la suite à donner à la procédure.

39. Par lettre datée du 28 mai 2002, la Défenderesse n°2 a renvoyé au Tribunal Arbitral copie de l'Acte de Mission dûment signé par elle et a signifié son

intention de prendre part à la procédure arbitrale, si une audience pour la comparution des parties était fixée par le Tribunal Arbitral et la notification en était faite au moins 30 jours à l'avance, accompagnée d'une invitation personnellement adressée au signataire de la lettre, soit M. Alphonse Muyumba Kelenge, Président du Comité de Gestion Provisoire de la S.N.EL ainsi qu'à M. Loliki M'Bembe, Chef de la Division Juridique de la S.N.EL.

40. Le 14 juin 2002, le Secrétariat de la Cour a informé les parties de la réception de l'Acte de Mission signé par la Défenderesse n°1.
De cette manière et bien que par étapes successives, l'Acte de Mission a été finalement signé par toutes les parties.

41. Entre-temps, le Tribunal Arbitral avait adopté un calendrier prévisionnel de la procédure arbitrale et en avait informé les parties ainsi que le Secrétariat de la Cour (communication du 3 mai 2002). Ce dernier avait transmis le calendrier prévisionnel à la Cour lors de sa session du 31 mai 2002 (communication du 31 mai 2002).

42. Dans le délai établi par Ordre du 23 mai 2002 (soit, comme on l'a dit, avant le 28 juin 2002) la Demanderesse a présenté son mémoire, accompagné d'un dossier de documents, ainsi que les déclarations écrites rendues par trois témoins.

43. Dans ce mémoire, les conclusions d'ENERGOINVEST sont formulées de la manière suivante :
*« En conclusion, le Demandeur demande au Tribunal Arbitral qu'il rende une sentence :*

    *i)    ordonnant aux Défendeurs de payer, conjointement et solidairement au Demandeur, la somme de 18,430,555.54 dollars plus les intérêts*

*au taux contractuel de 8,75% à compter de la date d'échéance de chaque versement et jusqu'au paiement effectif;*

ii) *ordonnant aux Défendeurs de payer, conjointement et solidairement, au Demandeur les coûts de la procédure d'arbitrage (comprenant les frais d'avocat, les coûts internes, les frais d'experts et autres dépenses associés);*

iii) *avec intérêts sur les montants octroyés aux taux d'intérêts correspondant;*

iv) *faisant suite à toute autre demande d'Energoinvest que le Tribunal jugera appropriée. »*

44. Les deux Défenderesses n'ont soumis aucune réponse à la Demande d'Arbitrage dans le délai qui leur avait été imparti par Ordre du 23 mai 2002. Toutefois, compte tenu de la lettre de la S.N.EL du 28 mai 2002 demandant la convocation d'une audience, le Tribunal Arbitral, par Ordre du 3 juillet 2002, a fixé au 12 septembre 2001 à 10 heures une audience des parties à Zurich, au siège du Cabinet d'Avocats Schellenberg Wittmer.

45. Par lettre du 12 juillet 2002 adressée au Tribunal Arbitral, la S.N.EL s'est justifiée de ne pas avoir déposé de réponse à la Demande d'Arbitrage en disant qu'elle croyait devoir attendre que la demande soit mieux précisée et la soumission de documents complétée et que d'ailleurs, elle avait rencontré des difficultés de compréhension du fait que la demande ainsi que certains documents étaient en langue anglaise. Pour ces raisons elle a demandé qu'un nouveau délai lui soit accordé.

46. Par Ordre du 18 juillet 2002, le Tribunal Arbitral a décidé qu'il ne pouvait pas accorder un nouveau délai à la S.N.EL, délai qui ne changeait de toute manière pas le fait qu'elle n'avait pas fait connaître sa réponse à la Demande d'Arbitrage à tout moment et jusqu'à l'audience du 12 septembre 2002,

audience qui avait été fixée, entre autres, justement pour « [...] *donner aux Défenderesses une chance additionnelle de s'exprimer et de participer activement à la procédure.* »

47. Par le même Ordre, le Tribunal a attiré l'attention des parties sur le paragraphe G-3 de l'Acte de Mission, conformément auquel:
« *La langue de l'arbitrage est la langue française.*
*La Demanderesse est autorisée à utiliser la langue anglaise dans ses soumissions, mais dans ce cas, si les Défenderesses le demandent, elle devra fournir aux Défenderesses une traduction conforme en langue française.*
*Les documents produits par les parties et dont les originaux sont rédigés en une langue autre que la langue française ou la langue anglaise, devront être accompagnés d'une traduction conforme en langue française.* »
La Demanderesse était invitée à se conformer à cette disposition.

48. Le 22 juillet 2002, le Secrétariat de la Cour a informé le Tribunal Arbitral et les parties de la réception d'une lettre par laquelle Mes Didier Joseph et Daniel Fauquet du cabinet CMS Bureau Francis Lefebvre à Paris notifiaient avoir assumé la représentation de la Défenderesse n°2 et demandaient un terme de deux mois pour répondre à la Demande d'Arbitrage.

49. Dans la même communication, le Secrétariat de la Cour prenait aussi note que la représentation de la Demanderesse était maintenant assurée non seulement par Mes Brenno Brunoni et Andrea Molino, du cabinet Spiess Brunoni Pedrazzini Molino à Lugano (Suisse), tel qu'indiqué dans la Demande d'Arbitrage, mais aussi par Mes Denforth Newcomb, Peter Griffin et Barbara Diggs du cabinet Shearman & Sterling à Paris.

50. Par Ordre du 26 juillet 2002, le Tribunal Arbitral a confirmé son Ordre précédent du 18 juillet 2002.

51. Le 12 septembre 2002 a eu lieu à Zurich l'audience prévue avec la participation des conseils de la Demanderesse ainsi que des conseils de la Défenderesse n°2.

Le Défenderesse n°1 ne s'est aucunement manifestée.

A cette occasion, les conseils de la Défenderesse n°2 soumettaient au Tribunal et aux conseils de la Demanderesse un Mémoire en Défense accompagné de documents.

Tout au long de l'audience les deux parties présentes ont eu l'opportunité d'exposer leurs arguments respectifs et de discuter de la suite à donner à la procédure. A conclusion de l'audience et avec l'accord des parties, le Tribunal a décidé :

- d'accorder à la Demanderesse un délai jusqu'au 4 octobre 2002 pour soumettre sa Réplique au Mémoire en Défense de la Défenderesse n°2;

- d'accorder à la Défenderesse n°2 un délai ultérieur jusqu'au 25 octobre 2002 pour soumettre sa Duplique;

- d'accorder aux deux parties un délai ultérieur jusqu'au 5 novembre 2002 pour faire connaître au Tribunal Arbitral si une prolongation de l'instruction de l'affaire était éventuellement souhaitée et pour quelles raisons et par quels moyens;

- de fixer l'audience de plaidoiries à Paris les jours 10 et 11 décembre 2002, en l'absence d'une demande de prolongation de l'instruction.

52. Le 4 octobre 2002, la Demanderesse a présenté son Mémoire en Réplique, accompagné de quatre documents.

53. Le 25 octobre 2002, la Défenderesse n°2 a présenté son Mémoire en Duplique, accompagné de trente documents.

54. Aucune des parties n'a demandé une prolongation de l'instruction.

55. L'audience de plaidoiries en présence du Tribunal Arbitral a eu lieu comme prévu le 10 décembre 2002 au siège de la Cour Internationale d'Arbitrage de la CCI à Paris, avec la participation de :

- Mes. Andrea Molino, Peter Griffin et Suzy Pedrinis, pour la Demanderesse;

- Me. Didier Joseph pour la Défenderesse n°2;

- M. Loliki Mbente, Chef de la Division Juridique de la S.N.E..

Personne ne s'est présenté pour la Défenderesse n°1.

56. Aucune question préliminaire n'ayant été soulevée, les conseils des parties présentes ont plaidé et contre-plaidé. Ils ont aussi remis au Tribunal un sommaire écrit de leurs arguments et de leurs conclusions.

57. En particulier, la Défenderesse n°2 a déclaré que abstraction faite de toute autre contestation, raison et argument de sa défense, elle n'avait pas de contestation à faire par rapport aux montants réclamés par la Demanderesse, ainsi que par rapport aux dates d'échéance à compter desquelles les intérêts sont réclamés (voir procès-verbal du 13 décembre 2002).

58. A conclusion de l'audience le Tribunal a prononcé la clôture des débats conformément à l'art. 22.1 du Règlement. Le 13 décembre 2002, il a fait parvenir aux parties ainsi qu'au Secrétariat de la Cour le procès-verbal de l'audience. Aucune des parties n'a soulevé de remarque à ce procès-verbal



# III - LES PARTIES

## A. ENERGOINVEST

59. La société **ENERGOINVEST** est une société d'ingénierie fondée en 1951, dont le siège social est à Sarajevo (Bosnie-Herzégovine).

60. La documentation que la Demanderesse a présentée au sujet de son activité démontre qu'il s'agit d'une société bien connue et affirmée sur le plan international, agissant dans plusieurs domaines de l'ingénierie, avec une spécialisation dans le domaine de l'énergie électrique et notamment dans la conception et la construction de postes de transformation électrique, de lignes de transport à haute tension et d'équipements électriques.

61. Il n'est pas surprenant que la République du Zaïre, au moment où elle a décidé d'investir dans le développement de ses ressources hydroélectriques et dans la modernisation de ses infrastructures, y compris les lignes de transport d'énergie électrique à haute tension et les postes de transformation et de distribution de l'énergie électrique, se soit adressée à ENERGOINVEST. D'autant que la proposition d'ENERGOINVEST était non seulement digne de confiance d'un point de vue technique, mais sans doute très intéressante pour la République du Zaïre d'un point de vue financier.

62. Les Défenderesses n'ont jamais contesté qu'ENERGOINVEST a rempli ses obligations contractuelles. Le projet «*Mobayi*» a bel et bien été achevé par ENERGOINVEST à leur pleine satisfaction, et ceci malgré les problèmes de remboursement du crédit qui s'étaient manifestés déjà lors des travaux et qui font l'objet de la présente procédure d'arbitrage.

63. Par ses mémoires et par certains des documents qu'elle a produits, la Demanderesse n'a pas manqué de rappeler au Tribunal Arbitral les événements tragiques qui se sont produits en Bosnie-Herzégovine et les dommages très sérieux qu'elle a subis directement et indirectement à la suite de ces événements. Le Tribunal Arbitral exprime toute sa compréhension à cet égard, mais il doit également remarquer que ces événements ne sont pas en rapport avec le litige qui oppose les parties dans cet arbitrage et qu'ils ne sauraient par conséquent influencer sa décision en aucune manière. Celle-ci sera exclusivement fondée sur l'analyse de la relation contractuelle entre les parties, des faits qui la concernent et des droits et obligations qui en découlent, en appliquant la loi que les parties ont choisie pour régler leurs différends.

## B. LA REPUBLIQUE DEMOCRATIQUE DU CONGO

64. La **République Démocratique du Congo (RDC)** est le même Etat que celui dénommé « République du Zaïre » au temps où l'Accord de Crédit et les contrats concernant le projet «*Mobayi*» ont été signés avec ENERGOINVEST. En effet, le nom de République Démocratique du Congo était le nom initialement attribué à ce pays en juin 1960 lorsque le Congo Belge a été proclamé un Etat indépendant, mais à la suite de la prise de pouvoir par le Général Mobutu en 1970 le nom avait été changé en celui de « République du Zaïre ». Lorsque le Président Mobutu a été renversé en mai 1997, son successeur le Président Laurent Kabila a redonné au pays son ancien nom de République Démocratique du Congo.

65. Par conséquent, si en cette sentence le Tribunal Arbitral fait référence à la République du Zaïre, pour la période pertinente, cette référence doit en tout cas être entendue comme référence au même Etat que celui qui porte aujourd'hui le nom de République Démocratique du Congo. Il ne se pose dans ce cas même pas un problème de succession d'Etats, comme on peut en rencontrer dans des

situations différentes : il y a tout simplement un changement de nom du même sujet juridique.

66. Même si la RDC est un Etat ayant des ressources naturelles importantes, parmi lesquelles on compte son potentiel hydroélectrique; des facteurs tels que l'instabilité politique, les mouvements de rébellion et l'infiltration dans le pays de forces militaires de pays voisins, tels le Rwanda et l'Uganda, ont lourdement pesé sur l'économie du pays.

Le Tribunal Arbitral apprécie les difficultés financières qui peuvent en découler pour la RDC, mais de la même façon qu'on l'a dit par rapport à la situation économique d'ENERGOINVEST, il s'agit là d'événements dépourvus de tout rapport avec la situation factuelle et juridique des relations contractuelles entre les parties au présent arbitrage et le jugement de ce Tribunal doit en faire abstraction.

## C. LA SOCIETE NATIONALE D'ELECTRICITE

67. La **Société Nationale d'Electricité (S.N.EL)** est une « Société d'Etat », comme on peut le lire sur son papier à lettre (voir les nombreux documents qui proviennent de la S.N.EL et qui ont été produits par l'une ou l'autre des parties dans cet arbitrage). Bien que dotée d'autonomie juridique, il s'agit donc d'une société qui a été fondée par l'Etat en 1970 et qui appartient à celui-ci à 100% . En particulier, il s'agit de l'organisation étatique responsable pour la génération, la transmission et la distribution de l'énergie électrique dans le pays.

68. Il est donc tout à fait logique, tel qu'on le dit dans l'Accord de Crédit du 4 mars 1986, que la réalisation du projet « *Mobayi* » ait été confiée par l'Etat à la S.N.EL , « *bénéficiaire du crédit* » et « *Maitre de l'Oeuvre* » désigné pour la conclusion des contrats commerciaux avec ENERGOINVEST.

## IV - JURIDICTION DU TRIBUNAL ARBITRAL

69. Lors de sa session du 18 mai 2001 la Cour Internationale d'Arbitrage de la CCI a entre autres décidé de mettre en route la procédure d'arbitrage conformément à l'article 6(2) du Règlement, parce qu'il apparaît *prima facie* que les parties, dans leur relation contractuelle, sont liées par une clause d'arbitrage visant le Règlement de la CCI.

70. La clause en question, à laquelle ENERGOINVEST fait référence dans sa Demande d'Arbitrage, est celle incorporée dans l'Accord de Crédit à l'article 7 (voir paragraphe 21 de la présente sentence).

71. La Défenderesse n°2 n'a pas contesté la validité de la clause arbitrale et partant se soumet à la juridiction du présent Tribunal Arbitral.

72. Toujours en conformité avec l'article 6(2) du Règlement, ainsi qu'au point D-1 de l'Acte de Mission, il appartient à présent au Tribunal de se prononcer quant à sa juridiction par rapport à la Défenderesse n°1.

73. La RDC est sans aucun doute partie à l'Accord de Crédit. L'Accord a été signé par le Commissaire d'Etat aux Finances et Budget en qualité de représentant de la RDC et il a été ratifié le 5 avril 1986.

74. Dans l'acte de ratification, qui est signé par le Président de la République du Zaïre on lit, entre autres : « *Déclarons qu'il est accepté, confirmé et ratifié et promettons qu'il sera inviolablement observé* » (voir document n°4 annexé à la Demande d'Arbitrage).

75. Une « *Consultation Juridique* » rendue par le « *Bureau du Président-Fondateur, Président de la République* » (doc. n°5 annexé à la Demande d'Arbitrage) se termine par la conclusion suivante :

« *En foi de ce qui précède, le soussigné déclare et certifie :*

*1.1 que l'Accord de Crédit conclu le 04 mars 1986 entre la Société ENERGOINVEST, la République du Zaïre et la Société Nationale d'Electricité a été valablement contracté par une personne dûment mandatée, en l'occurrence, le Citoyen DJAMBOLEKA LOMA OKITONGONO, Commissaire d'Etat aux Finances et budget.*

*1.2 qu'à l'égard de la République du Zaïre, cet accord est devenu un acte juridique définitif en vertu de l'Ordonnance-Loi n°86-038 du 05 avril 1986 en autorisant la ratification et en vertu de l'instrument de ratification qui porte la même date;*

*1.3 qu'en conséquence, l'accord de crédit visé ici constitue, tant dans son fond que dans sa forme, un acte juridique parfaitement valide ayant force obligatoire et liant irrévocablement les parties contractantes aux conditions y stipulées.* »

76. La clause d'arbitrage (art. 7 de l'Accord de Crédit) prévoit que « *Tout différend ou litige [....] sera préalablement soumis à un règlement amiable entre les parties.* » Même s'il s'agissait là d'une condition au recours à l'arbitrage, il est certain qu'elle a été remplie. Au cours des années ENERGOINVEST a non seulement multiplié inutilement ses efforts pour obtenir le paiement de ses créances, mais des négociations entre les parties ont eu lieu à Paris en septembre 2001 et c'est seulement suite à l'échec de ces négociations que les conseils d'ENERGOINVEST ont demandé au Secrétariat de la Cour la mise en route de la procédure d'arbitrage (voir lettre du 31 octobre 2001).

77. Les conclusions de l'avis juridique mentionné au paragraphe 72 ci-dessus, qui provient du Bureau du Président de la République du Zaïre, ne laissent donc aucun doute en ce qui concerne la validité de l'Accord de Crédit et sa force obligatoire de contrat liant irrévocablement les trois parties qui l'ont signé, dont l'une est la République du Zaïre.

Le seul problème qui reste à examiner afin d'éliminer tout doute au sujet de la juridiction de ce Tribunal Arbitral par rapport à la RDC est donc celui d'une éventuelle immunité de la RDC en raison de sa qualité d'Etat souverain, et ce bien qu'une telle exception n'ait été pas soulevée dans la procédure arbitrale.

78. La Défenderesse n°1 ne s'est manifestée dans cette procédure qu'à deux reprises :

- la première fois le 3 août 2001, par une lettre adressée à la Cour Internationale d'Arbitrage de la CCI et pour connaissance au conseil de la Demanderesse, dans laquelle le Ministre de la Justice et Garde des Sceaux a fait connaître que son Ministère a la compétence pour représenter l'Etat congolais dans la procédure d'arbitrage et a proposé d'avoir des négociations avec la Demanderesse afin de rechercher un règlement amiable du litige;

- la seconde fois le 8 juin 2002, lorsque le Ministre de la Justice et Garde des Sceaux a signé et renvoyé à la Cour l'Acte de Mission, ce dont la Cour a informé les parties par sa communication du 14 juin 2002.

79. Les deux actes mentionnés ci-dessus confirment, si besoin est, que la Défenderesse n°1 a bien connu l'existence de la Demande d'Arbitrage introduite contre elle par la Demanderesse et qu'elle a été constamment informée du déroulement de la procédure arbitrale. Toutes les communications faites aux parties par le Secrétariat de la Cour, de même que tous les Ordres et toutes les communications du Tribunal Arbitral lui ont été dûment notifiées.

80. Abstraction faite d'une certaine jurisprudence (notamment la jurisprudence française) selon laquelle un acte de mission ayant recueilli l'accord des parties peut valoir acceptation des parties de se soumettre à l'arbitrage (Voir Fouchard/Gaillard/Goldman « Traité de l'arbitrage commercial international », p.687 et 688), une telle acceptation est en tout cas explicite dans la clause d'arbitrage que la RDC a librement signée. La volonté de la RDC de soumettre à la juridiction arbitrale de la CCI les éventuels litiges découlant de l'Accord de Crédit est là sans équivoque et elle implique la renonciation à se prévaloir d'un éventuel privilège d'immunité souveraine.

81. Le principe selon lequel l'acceptation d'une clause arbitrale par un Etat est valide et contraignante est un principe largement affirmé par la doctrine aussi bien que par la jurisprudence. Quelques exemples :

- Craig, Park and Paulsson – International Chamber of Commerce Arbitration – 3rd edition – para. 8.13, p. 122 : « *It is not necessary for States or their emanations to waive whatever sovereign immunity they may be entitled to in other contexts in order to effect valid submission to arbitral jurisdiction. An agreement to arbitrate is sufficiently binding in and of itself. It is increasingly rare that a State or a State entity even raises the defense of sovereign immunity before an arbitral tribunal*[1].* »

Redfern and Hunter – Law and Practice of International Commercial Arbitration – p. 319 : "*During the course of arbitration proceedings to which a state is a party, the distinction between absolute and restricted immunity should be of no relevance. The arbitration can only proceed validly on the*

---

[1]   Traduction libre : « Afin de se soumettre à la juridiction arbitrale, il n'est pas nécessaire pour les Etats et leurs émanations de renoncer à l'immunité souveraine dont ils pourraient se prévaloir dans des contextes différents pour invalider leur soumission à une juridiction arbitrale. Une convention d'arbitrage est suffisamment contraignante par elle-même. Il est de plus en plus rare qu'un Etat ou une entité étatique soulève la défense de l'immunité souveraine devant un tribunal arbitral .»

*basis that the state concerned has agreed to arbitrate; and such an agreement is generally held to be a waiver of immunity, absolute or restricted[2]. "*

Fouchard, Gaillard, Goldman – Traité de l'arbitrage commercial international – para.642, p. 404 : « *La compétence des arbitres pour connaître des litiges que les Etats ou les organismes d'Etat jouissant de l'immunité ont accepté de leur soumettre ne fait aucun doute. Il est constant en effet que les bénéficiaires de l'immunité de juridiction peuvent renoncer à cette immunité. Or la convention d'arbitrage, qui vient contredire directement l'immunité, s'analyse nécessairement comme une renonciation par l'Etat ou l'organisme étatique concerné à son immunité de juridiction.* »

Sentence CCI – Affaire n° 2321 en 1974 – Recueil de sentences arbitrales CCI 1974-1985, p. 10 : « *The principle of pacta sunt servanda is generally acknowledged in international law...A sovereign State must be sovereign enough to make a binding promise both under international law and municipal law[3]. "*

Dans le même sens : la sentence arbitrale CCI dans l'affaire n°1526 en 1968, Clunet 1974, 915 avec note de Yves Derains, ainsi que la sentence CCI dans l'affaire n° 1939 en 1971, Rev. Arb 1973, 122.

82. On peut ajouter que, dans le cas d'espèce, la souveraineté de l'Etat n'entre pas en ligne de compte, parce que l'Accord de Crédit sur lequel la Demanderesse fonde sa demande est sans aucun doute un contrat de droit privé qui aurait pu être conclu par n'importe quel particulier.

---

[2] Traduction libre : « Au cours d'une procédure arbitrale à laquelle un Etat est partie, la distinction entre immunité absolue et immunité limitée devrait être insignifiante. L'arbitrage peut procéder valablement uniquement sur la base du fait que l'Etat est convenu d'avoir recours à l'arbitrage ; un tel accord est généralement considéré avoir valeur de renonciation à l'immunité, qu'elle soit absolue ou limitée.»

[3] Traduction libre : « Le principe *pacta sunt servanda* est généralement reconnu en droit international [...] Un Etat souverain doit être suffisamment souverain pour pouvoir assumer des obligations soit en droit international soit en droit national. »

83. D'un principe acquis dans les arbitrages internationaux, l'immunité de l'Etat n'est pas une règle absolue. Il faut distinguer entre les actes que l'on appelle «*jure imperii*», c'est-à-dire les actes accomplis par l'Etat dans l'exercice de sa souveraineté, et les actes que l'on appelle «*jure gestionis*», c'est-à-dire les actes accomplis par l'Etat dans le domaine du droit privé et qui pourraient être accomplis par n'importe quel sujet privé. En d'autres termes, même si l'on peut admettre que les actions d'un Etat ont toujours une finalité d'intérêt public, le critère n'est pas pris du but des actes, mais de leur nature, afin de savoir s'ils relèvent de ce pouvoir souverain dont seul l'Etat dispose ou il s'agit d'actes que tout particulier pourrait accomplir.

84. Ce principe que l'on appelle de souveraineté restreinte et la distinction entre actes «*jure imperii*» et actes «*jure gestionis*» sur laquelle il est fondé ont été constamment reconnus et appliqués en droit suisse, qui est le droit auquel les parties se sont soumises d'un commun accord (article 6 de l'Accord de Crédit). L'application du droit suisse a été confirmée également dans l'Acte de Mission, que toutes les parties ont signé sans réserve.

85. A titre d'exemple, on peut rappeler un cas similaire qui a été jugé par le Tribunal Fédéral Suisse (ci-après : « TF ») en 1989. Un Etat d'Amérique du Sud avait alors, dans le but de financer deux contrats de développement industriel, garanti aux deux syndicats des banques demanderesses le remboursement des fonds engagés. Il était indéniable pour le TF que l'Etat avait agi comme un particulier et que son engagement ne différait pas de l'engagement commercial qu'aurait pu prendre un quelconque particulier[4].

---

[4] ATF 124 III 382, cons. 4.
Dans le même sens :
Arrêt du Tribunal Fédéral Suisse du 20 décembre 1947 (ATF 73 III 158);
Arrêt du Tribunal Fédéral Suisse du 15 novembre 1978 (ATF 104 1A 367);
Arrêt du Tribunal Fédéral Suisse du 21 mars 1984 (ATF 110 1A 43);

86. La Suisse est d'ailleurs l'un des pays a avoir ratifié la Convention Européenne sur l'Immunité des Etats de 1972[5] et cette Convention, à son art. 12(1) prévoit justement qu'un Etat ne peut pas invoquer l'immunité de la juridiction arbitrale lorsqu'il a signé une convention d'arbitrage concernant des disputes en matière civile ou commerciale.

**Pour toutes ces raisons, le Tribunal statue qu'il a juridiction par rapport à la République Démocratique du Congo ainsi que par rapport à la S.N.EL.**

## V - DROIT DE LA DEMANDERESSE AU PAIEMENT DES SOMMES RECLAMEES

87. Dans les conclusions qu'elle a formulées lors de l'audience de plaidoiries avant la clôture des débats, la Demanderesse a confirmé les conclusions de son mémoire du 28 juin 2002 dans lesquelles elle a réclamé le paiement d'« *un montant de US$ 18,430,555.54, plus les intérêts au taux contractuel de 8,75% à compter de la date d'échéance de chaque versement et jusqu'au paiement effectif.* »

88. La base d'une telle demande est la lettre du Ministre des Finances de la République du Zaïre en date du 4 mars 1991 (doc. n°6 annexé à la Demande d'Arbitrage).

89. La lettre en question avait été adressée par le Ministre des Finances au Gouverneur de la Banque du Zaïre et en copie au Premier Ministre, au Secrétaire d'Etat aux Finances et pour connaissance à ENERGOINVEST. Elle

---

[5] RS 0.273.1.

faisait état des créances d'ENERGOINVEST par rapport aux deux projets dont la société yougoslave avait été chargée et qu'elle avait financés à 85% ( Projet «*Katana-Goma*» et Projet «*Mobayi* »). Dans des tableaux annexés à la lettre on donne les détails des arriérés pour chacun des projets. La lettre se termine par la proposition du Ministre des Finances de payer mensuellement à ENERGOINVEST une somme d'un million de dollars « [...] *à partir de janvier 1991 jusqu'à l'apuration complète de ces arriérés et la couverture totale des échéances régulières convenues.* »

90. Il résulte de ladite lettre que le total de la créance d'ENERGOINVEST pour le financement du Projet «*Mobayi* » était au début de US$ 24,147,775.68, dont US$ 15,300,000 pour le capital (voir doc. n°34 annexé au Mémoire du 28 juin 2002), US$ 7,026,408.53 pour les intérêts contractuels (voir doc. n° 34 annexé au même Mémoire), et US$ 1,821,367.15 à titre d'intérêts intermédiaires (voir doc. n°2-D annexé au Mémoire du 28 juin 2002).

91. ENERGOINVEST reconnaît que certains paiements lui ont été faits, même si avec du retard par rapport aux échéances contractuelles, entre 1991 et 1992. Elle indique le total de ces paiements (voir paragraphe 73 de son Mémoire du 28 juin 2002) en US$ 6,074,028.14 (ce qui est erroné, comme on le dira ci-après) et elle ajoute (voir paragraphe 75 du même Mémoire) que de telle manière sa créance se réduit à US$ 18,073.747.10 (ce qui est également erroné).

92. A ce dernier montant il faut ajouter la somme de US$ 356,808.53 qui correspond au total des intérêts de retard dus en conséquence du retard avec lequel les paiements reçus ont été faits (voir le doc. n° 36 annexé au Mémoire du 28 juin 2002, soit la lettre du 22 février 1991 par laquelle les intérêts de retard ont été réclamés).

93. Le total de US$ 18,430,555.54 figurant aux conclusions de la Demanderesse devrait donc être le résultat de l'addition de la somme de US$ 18,073,747.10 avec la somme de US$ 356,808.53 (ce qui encore une fois est erroné, parce que le total d'une telle addition serait de US$ 18,430,555.63).

94. En effet, les calculs de la Demanderesse aux paragraphes 72, 73, 74 et 75 de son Mémoire du 28 juin 2002 contiennent plusieurs petites erreurs matérielles et plus exactement :

- dans le tableau des paiements reçus (paragraphe 73) le total de US$ 6,074,028.14 est erroné. Le total exact de l'addition est de US$ 6,074,028.74.

- dans le tableau au paragraphe 75 le total initialement dû indique US$ 24,147,775.15, alors que le montant exact est de US$ 24,147,775.68 (voir paragraphe 72);

- dans le même tableau au paragraphe 75 le total des paiements reçus qui, comme on l'a dit, est de US$ 6,074,028.74 et non pas de US$ 6,074,028.14 doit être corrigé;

- par effet de toutes ces corrections, le « Sous-Total » exact dans le même tableau sera de US$ 18,073,746.94 et non pas de US$ 18,073,747.10;

- enfin, si on ajoute US$ 356,808.53 (intérêts de retard), le montant total de la créance (dans le même tableau du paragraphe 75) sera de US$ 18,430,555.47 et non pas de US$ 18,430,555.54.

95. Le Tribunal Arbitral admet la créance de la Demanderesse dans le montant total corrigé tel que mentionné ci-dessus, soit US$ 18,430,555.47.

96. Puisque le calcul de ce montant résulte de la lettre du Ministre des Finances du 4 mars 1991, déjà plusieurs fois mentionnée en cette sentence, l'on peut affirmer que la République Démocratique du Congo, par la voix de son

Ministre des Finances, a reconnu le droit d'ENERGOINVEST au paiement de cette somme.

La reconnaissance de dette est connue en droit suisse (article 17 CO). Pour être valable, elle doit être communiquée au créancier, ce qui est le cas puisqu'une copie de la lettre du 4 mars 1991 a été officiellement transmise à ENERGOINVEST.

97. En ce qui concerne la S.N.EL, sa défense consiste à dire qu'elle n'est pas débitrice, mais elle ne conteste pas l'exactitude du montant réclamé par ENERGOINVEST. A l'occasion de l'audience de plaidoiries elle a explicitement déclaré que, abstraction faite de toute autre contestation, raison et argument de sa défense, elle n'avait pas de contestation à faire par rapport aux montants réclamés par la Demanderesse, ainsi que par rapport aux dates d'échéance à compter desquelles les intérêts sont réclamés (voir le procès-verbal de ladite audience).

98. Toutefois, le Tribunal Arbitral remarque que le total de la créance d'ENERGOINVEST (soit US$ 18,430,555.47) se compose de deux éléments de nature différente : un premier montant (US$ 18,073,746.94) correspond au total de la somme pour capital et intérêts conventionnels qui n'a pas été payée aux échéances contractuelles, tandis que le deuxième montant (US$ 356,808.53) correspond à des intérêts de retard qui sont dus par rapport à des paiements qui ont été effectués mais qui, justement, ont été effectués en retard. Par conséquent et en raison de la nature différente des deux créances, la Demanderesse n'a pas le droit de les additionner pour réclamer que les intérêts contractuels soient appliqués sur le total.

Ce problème, qui concerne en effet la demande de paiement d'intérêts, sera considéré ultérieurement par le Tribunal dans la Section de cette sentence qui sera consacrée à la demande de paiement des intérêts.

A présent, une fois que l'on a établi quelles sont les créances de la Demanderesse, il est temps de voir qui est (ou qui sont) le(s) débitrice(s).

## VI - ENGAGEMENT DE LA RDC

99. L'engagement de la RDC ne fait aucun doute. Elle est certainement partie à l'Accord de Crédit du 4 mars 1986 et comme on l'a déjà dit (voir la Section IV de cette sentence) elle ne peut pas se prévaloir de son immunité étatique.

100. De plus, l'Accord de Crédit est certainement un contrat commercial que l'Etat a librement négocié et accepté dans l'exercice d'une activité de droit privé (« *jure gestionis* ») et non pas dans l'exercice de son pouvoir souverain (« *jure imperii* »). Un contrat qui, si on veut s'en tenir à la promesse solennellement formulée par le Président du Zaïre dans l'acte de ratification de l'Accord, « *sera inviolablement observé* ».

101. On peut ajouter que la lettre du Ministère des Finances du 4 mars 1991, à laquelle on a fait référence plusieurs fois dans cette sentence, n'est pas seulement une reconnaissance de dette, et par cela une reconnaissance de la défaillance de l'Etat dans ses obligations contractuelles, mais elle est aussi une confirmation additionnelle de l'engagement de l'Etat vis-à-vis d'ENERGOINVEST, puisqu'elle se termine par la demande que le Ministre des Finances adresse au Gouverneur de la Banque du Zaïre, ainsi qu'au Premier Ministre et au Secrétaire d'Etat aux Finances, afin qu'un paiement mensuel d'un million de dollars US soit effectué en faveur de ENERGOINVEST, « *par débit du compte général du Trésor* ».

102. La S.N.EL elle-même, qui (on ne doit pas l'oublier) est une « Société d'Etat », ne conteste pas la responsabilité de la RDC. Au contraire : elle soutient que seule la RDC est responsable, ce que nous allons voir dans la Section suivante.

## VII - ENGAGEMENT DE LA S.N.EL

103. La S.N.EL demande au Tribunal Arbitral de juger qu'elle n'est pas débitrice de l'obligation contractée par l'Etat et que par conséquent, elle doit être mise hors de cause et qu'ENERGOINVEST doit être déboutée de l'ensemble des demandes faites à son encontre.

104. Les arguments de la S.N.EL sont les suivants :

- o Il n'y a jamais eu un « prêt », mais seulement l'aménagement de l'obligation de payer des prestations de construction.
- o L'Accord de Crédit n'a pas d'autonomie juridique : il dépend du contrat principal préalablement conclu et dont il aménage les modalités de paiement.
- o Dans ce contrat, la République du Zaïre est la seule contractante d'ENERGOINVEST: la S.N.EL n'est pas partie à ce contrat qu'elle a signé seulement en tant que mandataire de la République du Zaïre.
- o Le fait que la S.N.EL ait accepté les traites tirées sur elle par ENERGOINVEST et avalisées par l'Etat en conformité avec l'Accord de Crédit, ne signifie pas pour elle une obligation de paiement, parce qu'il s'agit d'un « tirage pour compte ».

Le Tribunal Arbitral va examiner ci-après chacun de ces arguments.

105. Le projet «*Mobayi*» est certainement un projet d'intérêt public d'une grande envergure. Sa nature de projet « d'utilité publique » résulte très clairement de l'Arrêté Départemental du 14 juin 1986 (doc. n°7 annexé au Mémoire de la Défenderesse n°2).

106. Comme cela se produit habituellement pour de tels projets, il est tout à fait normal que la décision politique et stratégique de leur réalisation soit adoptée par l'Etat et que, dans ce but, l'Etat se charge non seulement de trouver un fournisseur de services et d'équipements auquel on puisse faire confiance du point de vue technique, mais également et même en premier lieu, de trouver quelqu'un qui puisse accorder un crédit d'un montant et d'une durée qui permettent le financement de l'ouvrage.

107. Dans le cas d'espèce, la particularité des relations contractuelles entre la République du Zaïre et la S.N.EL d'une part et ENERGOINVEST d'autre part consiste dans le fait qu'un seul sujet (ENERGOINVEST) remplisse les deux fonctions de bailleur de fonds et de contractant technique pour les études, les livraisons et les services. C'est là la raison qui conduit la Défenderesse n°2 à dire que finalement l'Accord de Crédit n'est rien d'autre que l'aménagement des modalités de paiement des fournitures et services prévus par le contrat pour la réalisation de l'ouvrage (contrat qu'elle appelle « principal »).

108. Un tel argument n'est pas soutenable: l'identité des sujets ne change rien à l'autonomie substantielle et juridique des deux contrats.

109. Il est certain que les parties ont voulu donner une autonomie juridique à l'Accord de Crédit, qui avait déjà une autonomie substantielle par rapport à la réalisation du projet auquel le financement était destiné. Elles ont voulu négocier et signer un contrat indépendant pour le financement du projet et c'est dans ce but qu'elles ont signé l'Accord de Crédit. S'il s'était seulement agi de l'aménagement des conditions de paiement des livraisons et des services, on ne voit pas pourquoi elles ne l'auraient pas fait au sein du contrat concernant ces mêmes livraisons et services, et ce dans la clause contractuelle relative aux conditions de paiement.

110. Il est évident qu'il y a une connexion entre les conditions de paiement du contrat concernant la réalisation du projet et l'Accord de Crédit qui procure les moyens financiers, de telle manière que le paiement des fournitures et des services, à la hauteur du 85% se fait (comme on le lit dans le contrat qui les concerne) « *par imputation sur le crédit accordé au Maître d'œuvre par le Contractant* ». Mais l'Accord de Crédit, auquel on fait nécessairement référence dans les conditions de paiement des fournitures et services, est et reste bien autonome par rapport à tel contrat: il suffit de considérer qu'il est prévu dans l'Accord de Crédit que le remboursement du prêt et le paiement des intérêts conventionnels se fassent par l'émission de traites devant être acceptées par la S.N.EL et avalisées par l'Etat. Le droit d'émission de ces traites, de la même manière que l'obligation de les accepter, de les avaliser et de les payer aux échéances convenues n'a rien à voir avec les livraisons de fournitures et services.

111. Le montant du financement prévu dans l'Accord de Crédit confirme également l'autonomie de cet Accord. En effet, quand on dit qu'ENERGOINVEST s'engage à financer 85% de la valeur totale en devise étrangère des fournitures et services qui seront définis dans les détails seulement dans les contrats commerciaux, on ne connaît pas encore la valeur de ces fournitures et services, tandis que le montant du financement est déjà fixé à US$ 22,525,000.

A la date à laquelle l'Accord de Crédit a été signé, le seul contrat pour fournitures et services qui avait été signé un mois avant (le contrat du 6 février 1986) prévoyait une imputation au crédit seulement pour US$ 11,301.522 (voir doc. n°1 annexé au Mémoire de la Défenderesse n°2). Des avenants à ce contrat ont été conclus dans les années suivantes et le montant final du financement a atteint le chiffre de US$ 15,300,000 (montant total des traites pour le capital).

Puisque l'Accord avait été conclu et qu'il était valable pour un montant plus élevé, cela confirme son autonomie totale substantielle et juridique.

112. En d'autres termes, l'Accord du 4 mars 1986 comporte pratiquement de la part d'ENERGOINVEST la concession d'une ligne de crédit au bénéfice de la contrepartie zaïroise. Cette ligne de crédit, conformément à l'engagement d'ENERGOINVEST, peut atteindre le montant maximum de US$ 22,525,000. L'imputation concrète à la ligne de crédit du paiement des fournitures et services (dans la limite de 85% de leur valeur) va se faire au fur et à mesure de la conclusion des contrats commerciaux.

113. Il s'agit d'un schéma de financement assez ordinaire, qui présuppose la stipulation de l'Accord de Crédit en tant que contrat autonome et la conclusion de marchés particuliers dont le paiement, dans la mesure convenue, se fait par imputation à la ligne de crédit.

114. L'autonomie de l'Accord de Crédit par rapport aux contrats d'achat d'équipements et services est donc indiscutable.

115. D'ailleurs, si l'Accord de Crédit n'était pas un contrat juridiquement autonome, il n'y aurait pas eu besoin d'un acte officiel de ratification de l'Accord par le Président de la République du Zaïre en date du 5 avril 1986, dûment autorisé par l'Ordonnance-Loi n°86-038 portant la même date.
Une telle procédure en matière d'emprunts est tout à fait conforme à la loi zaïroise de l'époque, tel que le confirme la « Consultation Juridique » rendue par le Bureau du Président de la République du Zaïre le 7 mai 1986 (voir doc. n°5 annexé à la Demande d'Arbitrage).

116. Une fois que l'autonomie juridique de l'Accord de Crédit est établie et vu que la Demande d'Arbitrage n'est pas fondée sur le Contrat du 8 février 1986,

mais exclusivement sur l'Accord de Crédit et sur la reconnaissance de dette de la lettre du Ministère de Finances du 4 mars 1991, il n'y a aucun besoin de se référer au Contrat du 8 février 1986 pour décider de l'affaire. Il suffit de constater que la S.N.EL est partie à l'Accord de Crédit en tant que co-emprunteur avec l'Etat zaïrois.

117. L'affirmation de la S.N.EL tendant à dire qu'elle n'est pas partie à l'Accord de Crédit n'est pas fondée.

118. La S.N.EL est en effet expressement indiquée comme partie à cet Accord avec la République du Zaïre d'une part et face à ENERGOINVEST d'autre part.
Le fait que la République du Zaïre soit dénommée l'« *EMPRUNTEUR* » et que la S.N.EL participe à l'Accord *en tant que bénéficiaire du crédit* » ne change rien aux obligations envers ENERGOINVEST qui découlent de l'Accord.

119. En conformité avec l'article 18 CO : « *Pour apprécier la forme et les clauses d'un contrat, il y a lieu de rechercher la réelle et commune intention des parties, sans s'arrêter aux expressions ou dénominations inexactes dont elles ont pu se servir [...]* »

120. Dans le contexte de l'Accord, le mot « Emprunteur » est souvent utilisé pour désigner la S.N.EL. Par exemple :

   ○ À l'article 3.2 on parle d'un « Ingénieur-Conseil choisi par l'EMPRUNTEUR », alors que l'article 2.c du Contrat du 8 février 1986 précise que l'Ingénieur-Conseil « *a été désigné par le Maître d'Oeuvre* », soit par la S.N.EL, ce qui est tout à fait logique dans ce genre de contrats;

   ○ À l'article 4.1 on parle d'obligations de paiement à la charge de l'EMPRUNTEUR, celles-ci étant des obligations figurant à la

charge de la S.N.EL dans le Contrat du 8 février 1986 et qui en réalité ont été effectivement satisfaites par la S.N.EL (voir les documents des paiements reçus produits par la Demanderesse, doc. n°12-A et suivants annexés au Mémoire en Demande);

o  A l'article 3.6 on parle de l'obligation de l'EMPRUNTEUR d'obtenir une ordonnance en faveur du PRETEUR octroyant la garantie de l'Etat zaïrois, obligation clairement mise à la charge de la S.N.EL.

121. La S.N.EL a signé l'Accord « *Pour l'Emprunteur* », juste au-dessous de la signature du représentant de la République du Zaïre.

122. Le Tribunal est persuadé que la volonté d'ENERGOINVEST lors de la conclusion de l'Accord de Crédit était celle d'avoir en face d'elle deux sujets conjointement et solidairement obligés au remboursement du prêt qu'elle octroyait. Par conséquent il est logique de penser que l'Etat zaïrois et la S.N.EL ont accepté d'assumer une telle obligation solidaire par la signature conjointe de cet Accord.

123. L'engagement de la S.N.EL d'accepter les traites et de les faire avaliser par l'Etat est une confirmation ultérieure de sa responsabilité directe.

124. Puisque le projet comme on l'a dit, était « *d'utilité publique* », il est bien possible que la mise à disposition des fonds pour le remboursement du crédit soit à la charge de l'Etat. Il s'agissait néanmoins pour celui-ci de mettre les fonds à la disposition de la S.N.EL pour qu'elle puisse payer ENERGOINVEST, ce qui ne change rien au rapport d'obligation de ces dernières.

125. C'est justement là la faiblesse majeure des arguments de la Défenderesse n°2.

Il suffit de regarder tous les documents qu'elle a produits en annexe à son Mémoire en Duplique. Il s'agit de correspondance ou d'actes internes à l'Administration zaïroise, à partir desquels il est facile de reconstituer le scénario suivant : l'Etat ne dispose pas de fonds suffisants pour le remboursement du prêt; la S.N.EL est très préoccupée parce qu'ENERGOINVEST demande à être payée et il y a un risque pour que les travaux soient suspendus ou, dans le meilleur des cas, retardés; ENERGOINVEST intervient non seulement auprès de la S.N.EL mais aussi auprès des organismes d'Etat; et malheureusement tout effort semble être inutile parce que les échéances des paiements s'accumulent et les paiements ne sont pas faits.

126. A l'inverse de ce que prétend la Défenderesse n°2, une telle situation ne signifie pas que seul l'Etat soit débiteur d'ENERGOINVEST. Il y a là une confusion évidente entre la nature des rapports entre la S.N.EL et l'Etat (qui ne nous concernent pas) et celle des rapports entre la S.N.EL et ENERGOINVEST, qui font l'objet de cet arbitrage.

127. Il est bien possible que dans les rapports internes entre la S.N.EL et l'Etat ce soit l'Etat qui doive procurer les fonds pour le remboursement de la dette à ENERGOINVEST. Ce n'est pas à ce Tribunal de le déterminer. En tout cas, il est certain que la S.N.EL et l'Etat étaient tous deux obligés vis-à-vis d'ENERGOINVEST. Le fait qu'ENERGOINVEST soit intervenue directement auprès de l'Etat est bien normal puisque l'Etat est l'un des débiteurs mais cela ne comporte pas une renonciation d'ENERGOINVEST à ses droits envers la S.N.EL ou comme le prétend le Défenderesse n°2, une reconnaissance de la part d'ENERGOINVEST du seul engagement de l'Etat.

128. Nous avons déjà dit qu'une fois établi l'engagement de la S.N.EL sur la base de l'Accord de Crédit, les discussions qui ont eu lieu au sujet du Contrat du 8 février 1986 n'ont pas besoin d'être prises en considération par ce Tribunal.

En réalité, la S.N.EL a essayé d'introduire de telles discussions en s'appuyant sur l'allégation (que nous avons déjà déclarée fausse) selon laquelle l'Accord de Crédit n'aurait pas d'autonomie et qu'il faut se référer au Contrat du 8 février 1986 pour établir la nature de la relation entre les parties.

129. Le Tribunal estime nécessaire de se prononcer sur deux des questions soulevées par ce contrat :

○ Premièrement, le contrat en question n'est pas seulement conclu par la S.N.EL au nom et pour le compte de l'Etat. Elle l'a passé aussi en tant que « *Maître d'Oeuvre* » et toute une série d'obligations dans ce contrat sont à la charge du « *Maître d'Oeuvre* »;

○ Deuxièmement, l'affirmation de l'article 2.b selon laquelle : « *Les obligations imputées au Maître d'œuvre par le présent Contrat doivent se comprendre comme des obligations du Conseil Exécutif de la République du Zaïre* » ne signifie pas, comme le prétend la Défenderesse n°2, que seul l'Etat soit responsable de l'accomplissement de ces obligations, mais que l'obligation de l'Etat (« *Maître de l'Ouvrage* ») s'ajoute à celle de la S.N.EL (« *Maître de l'Oeuvre* »).

130. Les deux points ci-dessus sont importants parce qu'ils apportent la confirmation :

○ Que la « subrogation » de la S.N.EL à l'Etat « pour la réalisation des investissements », dont il est question à l'article 3.1 de l'Accord de Crédit, ne comporte pas une exclusion de tout

engagement de la S.N.EL, mais signifie au contraire que la S.N.EL est mandatée par l'Etat pour assumer toutes les obligations qu'il faut assumer « pour la réalisation des investissements », à commencer par la conclusion des contrats commerciaux ;

o   Que la conclusion des contrats commerciaux par la S.N.EL n'exclut pas la responsabilité de l'Etat, mais que l'Etat confirme au contraire se responsabilité solidaire avec la S.N.EL non seulement par rapport à l'Accord de Crédit, mais aussi par rapport aux contrats commerciaux.

Il s'agit donc de deux arguments que nous allons reprendre dans la Section suivante qui traite justement de la responsabilité solidaire des deux débiteurs.

## VIII - SOLIDARITE

131. ENERGOINVEST demande que les deux Défenderesses soient condamnées conjointement et solidairement au paiement en sa faveur des sommes réclamées. Selon elle, l'Accord de Crédit montre clairement que l'Etat et la S.N.EL se sont engagés solidairement au remboursement du prêt qui leur a été accordé par ENERGOINVEST, ce qui correspond d'ailleurs à la volonté et à l'intérêt d'ENERGOINVEST.

132. De plus, ENERGOINVEST estime que les deux Défenderesses avaient convenu d'unir leurs efforts pour la réalisation du projet, et ce en vue d'atteindre un but commun, ce qui, en conformité des articles 530 ss CO, est un comportement générateur d'une société simple qui implique une responsabilité conjointe et solidaire de ses membres (article 544 CO).

133. La S.N.EL s'oppose à ces arguments et affirme qu'il n'y a aucune responsabilité solidaire entre elle et l'Etat pour les raisons suivantes :

- o   Aucune clause de l'Accord de Crédit ne l'engage à la dette.
- o   La solidarité ne se présume pas en droit suisse. Elle doit résulter d'une déclaration explicite, à défaut de quoi « [...] *la solidarité n'existe que dans les cas prévus par la loi* » (article 143 CO).
- o   La collaboration entre les Défenderesses ne saurait caractériser l'existence d'une société simple, puisque dans le cas d'espèce il n'y a pas eu de mise en commun d'apports par chacun des prétendus associés, que les parties ne sont pas sur un pied d'égalité face au projet et que leurs buts, même s'ils convergent, ne sont pas constitutifs d'un but commun.

134. L'article 1044 alinéa 1 du Code des Obligations prévoit que : « *Tous ceux qui ont tiré, accepté, endossé ou avalisé une lettre de change sont tenus solidairement envers le porteur.* » Les traites prévues pour le remboursement du prêt ont été acceptées par la S.N.EL et avalisées par la RDC, si bien que celles-ci sont solidairement responsables.

De plus, le Tribunal Arbitral observe que même si la solidarité n'est pas présumée en droit suisse, il n'est pas nécessaire que la volonté de s'engager solidairement résulte d'une déclaration (écrite) explicite. L'exclusion de la présomption signifie simplement que le fait qu'une obligation soit prise en commun par une pluralité de sujets n'a pas automatiquement pour conséquence juridique leur solidarité pour une telle obligation. Toutefois, il n'est pas nécessaire que la volonté d'une pluralité de sujets de s'obliger solidairement soit expressément déclarée, étant suffisant qu'une telle volonté résulte tacitement d'autres manifestations (cf. ATF 116 II 712 ; ATF 49 III 205).

135. Le Tribunal Arbitral constate que la volonté de la République du Zaïre et de la S.N.EL de s'obliger solidairement résulte notamment :

> o Du fait que la S.N.EL, ainsi que l'on a déjà établi, est partie à l'Accord de Crédit et ce pratiquement en qualité de co-emprunteur (« bénéficiaire du crédit »).

> o Du fait que la forme prévue par les parties dans l'Accord de Crédit pour le remboursement du prêt, c'est-à-dire l'émission de traites que la S,N,EL s'engage à accepter et que l'Etat s'engage à avaliser, est une confirmation de la solidarité de l'obligation contractée per l'Etat et la S.N.EL conjointement.

> o Du fait que les obligations contractées par la S.N.EL en tant que « Maître d'œuvre » sont également à considérer comme des obligations de la République du Zaïre.

> o Du fait que des paiements en exécution de l'obligation du remboursement du prêt ont été effectués par la S.N.EL.

> o Du fait que le comportement de l'Etat et de la S.N.EL par rapport au remboursement du financement octroyé par ENERGOINVEST justifie pleinement le fait que cette dernière les considère solidairement obligés, même sur la base des principes de la bonne foi et de la confiance, qui sont des principes de base du droit suisse des obligations.

136. Pour toutes les raisons qui précèdent, le Tribunal Arbitral considère que l'obligation des deux Défenderesses concernant le paiement de la dette qu'elles ont conjointement contractée avec ENERGOINVEST est une obligation solidaire.

Ceci étant établi, point n'est besoin d'analyser la thèse subsidiaire de la Demanderesse au sujet d'une éventuelle société simple entre l'Etat et la S.N.EL, thèse qui, à première vue, semble assez douteuse.

## IX - DEMANDE DE PAIEMENT DES INTÉRÊTS

137. Dans ses conclusions, qui sont celles du Mémoire du 28 juin 2002, confirmées lors de l'audience de plaidoiries du 10 décembre 2002, la Demanderesse demande que les Défenderesses soient condamnées conjointement et solidairement au paiement d'un montant de US$ 18,430,555,54 au titre du capital « *plus les intérêts au taux contractuel de 8,75% à compter de la date d'échéance de chaque versement et jusqu'au paiement effectif.* »

Elle demande aussi que les Défenderesses soient condamnées au paiement additionnel d'intérêts « *sur les montants octroyés, aux taux d'intérêt correspondants* ».

138. Le Tribunal Arbitral a déjà affirmé dans cette sentence le droit de la Demanderesse au paiement de la somme de US$ 18,430,555.47 qui est le résultat de la correction d'une série de petites erreurs faites par la Demanderesse dans ses calculs (voir paragraphes 93 à 95 de la présente sentence).

139. Le Tribunal Arbitral a également remarqué que cette somme se compose de deux montants de nature différente : le montant de US$ 18,073,746.94 qui correspond au total des échéances de remboursement du crédit, pour capital et intérêts conventionnels, qui sont restées impayées, et le montant de US$ 356,808.53 qui correspond à des intérêts moratoires sur des paiements effectués en retard.

140. Le premier montant (US$ 18,073,746.94), correspond aux échéances de remboursement d'un prêt pour lequel les parties avaient convenu d'appliquer le

taux d'intérêt de 8,75% par an. Puisque il n'y a pas de pénalisation conventionnelle en cas de retard de paiement, le même taux devra donc s'appliquer à la période de retard, calculé à compter de chacune des échéances impayées sur le montant respectif.

141. Au contraire, le deuxième montant (US$ 356,808.53), est une somme d'intérêts due suite à des paiements effectués en retard. ENERGOINVEST avait demandé le paiement de cette somme dans sa lettre du 22 février 1991, mais sa demande n'a pas été satisfaite.

Par conséquent, en conformité avec la disposition de l'article 105 CO « *Le débiteur en demeure pour le paiement d'intérêts [...] ne doit l'intérêt moratoire qu'à partir du jour de la poursuite ou de la demande en justice.* »

L'intérêt moratoire est de 5% par an, tel que fixé à l'article 104 CO, et il devrait donc être payé sur la somme en question à compter de la date d'introduction de la Demande d'Arbitrage. La CCI ayant reçu la Demande d'Arbitrage le 4 mars 2001, le Tribunal Arbitral décide que c'est à partir de cette date que les intérêts moratoires sont à calculer.

## X - FRAIS DE L'ARBITRAGE

142. Le Tribunal Arbitral est libre dans sa décision concernant les frais de l'arbitrage (article 31(3) du Règlement).

143. Malgré un tel pouvoir discrétionnaire, lui permettant de prendre en considération toute une série de circonstances qui, dans le cas d'espèce, pourraient justifier une allocation des frais s'écartant du principe selon lequel les frais sont à mettre à la charge de la partie qui succombe, ce principe demeure le plus généralement appliqué dans les arbitrages de commerce internationale et il est certainement le plus logique, puisque la nécessité pour

une partie d'avoir recours à une procédure d'arbitrage afin d'obtenir la reconnaissance de ses droits ne doit pas constituer pour elle une pénalisation, suite aux frais qu'une telle procédure entraîne.

144. Dans le présent arbitrage, le Tribunal ne voit pas de raisons de s'écarter dudit principe.

145. Même si on pouvait prendre en compte le fait que plusieurs questions débattues entre les parties et qui ont demandé une décision de la part du Tribunal trouvent leur origine dans une malheureuse rédaction des contrats, on devrait également considérer que, d'un côté, les deux parties sont responsables d'une telle mauvaise rédaction en égale mesure et, de l'autre côté, la volonté réelle des parties que le Tribunal a été parfois obligé de rechercher était bien connue par les parties elles-mêmes, ce qui signifie que la partie défaillante a été de mauvaise foi dans certaines de ses défenses.

146. La non-participation de la RDC à la procédure arbitrale, alors qu'elle avait pris part aux négociations qui ont échoué en septembre 2001, après l'introduction de la Demande d'Arbitrage et juste avant que la procédure ne soit mise en marche, ne se justifie nullement.

147. La participation de la S.N.EL à la procédure a été tardive (ce qui n'a pas manqué d'en causer une prolongation) et les nombreux arguments qu'elle a introduits à sa défense ont été finalement jugés sans fondement par le Tribunal.

148. Le Tribunal, comme on l'a déjà dit, n'est pas concerné par les éventuelles difficultés politiques ou économiques de la RDC (ce qu'il regrette profondément), de la même façon qu'il n'est pas concerné par les dommages subis par ENERGOINVEST suite aux événements politiques bien connus en Bosnie-Herzégovine (ce qu'il regrette en égale mesure). Il est concerné par un

contrat de commerce international que l'une des parties, à l'évidence, n'a pas respecté. Personne ne discute la créance d'ENERGOINVEST dans cette affaire, mais apparemment personne ne veut la payer : ni l'Etat qui est resté absent de l'arbitrage, ni la S.N.EL qui y a pris part uniquement pour affirmer, sans fondement, qu'elle ne serait pas débitrice. Personne n'a contesté non plus que le projet qui a été financé et réalisé par ENERGOINVEST ait été financé et réalisé à la parfaite satisfaction de la RDC et de la S.N.EL qui, depuis plus de dix ans déjà, bénéficient de l'ouvrage en question.

149. Pour ces raisons le Tribunal Arbitral décide que les frais de l'arbitrage doivent être entièrement payés conjointement et solidairement par les deux Défenderesses.

Ces frais comprennent :

- o Les honoraires et frais des arbitres fixés par la Cour pour un montant de US$ 215,880.-

- o Le frais administratifs qui se chiffrent à US$ 25,000.-

- o Les frais et honoraire de la défense d'ENERGOINVEST dans le montant de US$ 168,000.- demandé, que le Tribunal Arbitral considère adéquat et justifié.

= = = = = = = = = =

Pour toutes les raisons qui précèdent

## LE TRIBUNAL ARBITRAL STATUE A L'UNANIMITE

1. Le Tribunal Arbitral a juridiction par rapport à la République Démocratique du Congo (Défenderesse n°1) ainsi que par rapport à la S.N.EL (Défenderesse n°2).

2. Les deux Défenderesses sont condamnées conjointement et solidairement à payer à la Demanderesse la somma de US$ 18,430,555.47.

3. Les deux Défenderesses sont condamnées conjointement et solidairement à payer à la Demanderesse des intérêts comme suit :

   o Intérêts au taux de 8,75% par an sur la somme de US$ 18,073,746.94 à calculer sur la valeur de chaque tranche de paiement échue dont se compose ladite somme, à compter de l'échéance respective et jusqu'au paiement complet ;

   o Intérêts au taux de 5% par an sur la somme de US$ 356,808.53 à compter du 4 mars 2001 (date d'introduction de la Demande d'Arbitrage) jusqu'au paiement complet.

4. Les deux Défenderesses sont condamnées conjointement et solidairement à payer les frais de l'arbitrage, soit :

   o US$ 25,000.- à titre de frais administratifs de la Cour ;

   o US$ 215,880.- à titre de frais et honoraires des Arbitres ;

   o US$ 168'000.- à titre de remboursement des frais de défense de la Demanderesse.

Lieu de l'arbitrage : Paris.                              Le, 30 avril 2003

## LE TRIBUNAL ARBITRAL

Avv. Renato Roncaglia, Président

Dr. Marc Ronca, Co-Arbitre

Dr. Mohamed T. Abu-Samra, Co-Arbitre