UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ENERGOINVEST DD, | ) | CIV. _____ ___ ( ) |
| Petitioner, | ) | |
| v. | ) | |
| DEMOCRATIC REPUBLIC<br>OF CONGO and SOCIETE NATIONALE<br>D'ELECTRICITE (S.N.E.L.), | ) | |
| Respondents. | ) | |

## AFFIDAVIT OF SUSANNA MITTON

I, Susanna Mitton, as a principal of LanguageWorks, pursuant to 28 U.S.C. §
1746, hereby certify under penalty of perjury as follows:

1.     The attached translations of the "Accord de Credit" and the "Award" of

the International Court of Arbitration are accurate, true and correct translations of those French

language documents.

I certify under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct. Executed on this 12th day of June, 2003.

_____
(signature)

03 1315

**FILED**

**JUN 1 7 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## CREDIT AGREEMENT

By and between

The Republic of Zaire, represented by the State Commissioner of Finance and Budget, hereinafter referred to as the BORROWER, and the Société Nationale d'Electricité, S.N.EL., the recipient of the credit,

PARTIES OF THE FIRST PART,

And

The ENERGOINVEST Company, Ro ENERGOKOMERC on behalf of RO ENERGOINZEN-JERING, Bratstva Jedinstva 2, Sarajevo, Yugoslavia, represented by Mr. Hakija TURAJLIC, Chairman of the Business Committee of ENERGOKOMERC, hereinafter referred to as the LENDER,

PARTY OF THE SECOND PART.

### IT IS HEREBY AGREED AS FOLLOWS

### PREAMBLE – POWER GIVEN TO THE SOCIETE NATIONALE D'ELECTRICITE, S.N.EL.

The Republic of Zaire has authorized the Société Nationale d'Electricité, S.N.EL., to carry out the hydroelectric power project at Mobayi and to enter into contracts with the various intervening parties aimed at successfully exercising said power.

### ARTICLE 1 – PURPOSE OF THE CREDIT

ENERGOINVEST grants to the Republic of Zaire a credit issued in US dollars for the purpose of financing materials, services and equipment of Yugoslavian origin relating to:

1.1.    the hydroelectric power project at Mobayi, on the Ubangi river, sub-region of North-Ubangi, in the Republic of Zaire.

1.2.    the construction of a 30 kW electric power transmission line between Mobayi and Gbadolite and the construction of 30/6 kW transformer stations in Gbadolite

1.3     the restructuring of the distribution network in the city of Gbadolite and the surrounding areas.

## ARTICLE 2 – AMOUNT OF THE CREDIT

2.1.    This credit agreement concerns a commercial and financial operation, the total amount of which is US$ 26,500,000 (twenty-six million five hundred thousand US dollars).

2.2.    The credit is granted for a term of 10 (ten) years and shall bear interest at an annual rate of 8.75%.

2.3.    The LENDER undertakes to finance 85% of the total amount of the materials described in Article 1, namely US$ 22,525,000 (twenty-two million five hundred twenty-five thousand US dollars).

## ARTICLE 3 – COURSE OF PERFORMANCE

3.1.    To carry out the investments referred to in Article 1, the BORROWER undertakes to subrogate the Société Nationale d'Electricité (S.N.EL.), which shall enter into commercial contracts with ENERGOINVEST.

3.2.    The commercial contracts shall define in detail the total amount of the investment, the construction phases, the duration of the work, the conditions related to the advance planning, provision of equipment, supervision, set-up and commissioning of the facilities, and the conditions related to the intervention by a Consulting Engineer chosen and paid by the BORROWER.

3.3.    The payments to be made under this Credit Agreement and the commercial contracts shall be expressed in US dollars for the portion in foreign currency.

3.4.    All payments stipulated in this Credit Agreement and in the commercial contracts in favor of the LENDER shall be made through the intermediary of the Banque du Zaire and the Privredna Banka Sarajevo.

## ARTICLE 4 – ADVANCE PAYMENTS

4.1.    The BORROWER shall make an advance payment equivalent to 15% of the total amount in foreign currency of the Credit Agreement, namely US$ 3,975,000 (three million nine hundred seventy-five thousand US dollars). This amount shall be paid as follows: to free up the credit related to a commercial contract, the BORROWER shall make an advance payment equivalent to 15% of the total amount of the contract in question, within 30 days of the date on which the commercial contract is signed, to the LENDER's account opened at the Privredna Banka Sarajevo.

4.2.     The LENDER shall, at the time of the 15% payment, issue a bank guarantee in an amount equivalent to this advance payment in favor of the BORROWER. The bank guarantee shall be reduced automatically over time upon presentation of the invoices for the materials supplied and after approval of said invoices by S.N.EL. and its Consulting Engineer. This guarantee shall be reduced as the materials are provided using the approved invoices and shall be fully discharged at the time of the last delivery.

## ARTICLE 5 – FINANCING CONDITIONS

5.1.     The amount of the Credit related to each commercial contract shall be repaid within 10 (ten) years in 20 (twenty) equal semi-annual installments, the first of which shall be due 6 (six) months after the provisional acceptance of the project, but not later than 54 (fifty-four) months after the effective date of this Credit Agreement.

5.2.     For the repayment of the Credit, the LENDER shall, once the advance payment stipulated in Article 4, point 4.1. has been made, issue 20 (twenty) bills of exchange for the principal and 20 (twenty) bills of exchange for the interest, calculated at an annual rate of 8.75%, in accordance with the payment schedule accepted by both contracting parties.

5.3.     The bills of exchange drawn on S.N.EL. shall be endorsed by the State Commissioner in charge of Finance and deposited by S.N.EL. within 30 (thirty) days at Privredna Banka Sarajevo, Osnovna Banka Sarajevo.
         Within not more than one month following the provisional acceptance and within not more than 48 months after the effective date of this Credit Agreement, the contracting parties and their respective banks shall agree on the due date of the first bill of exchange for principal and for interest.
         The due dates of the other bills of exchange shall be automatically calculated based on the principle that each subsequent bill of exchange shall fall due six months after the preceding one.

5.4.     These bills of exchange, after being received by the LENDER, may be freely endorsed, cashed or used as a security deposit.

5.5.     During the construction period of the projects covered by this Credit Agreement, the BORROWER shall pay the LENDER interest during construction calculated based on the amount of credit actually used. This interest during construction shall be calculated and paid on an actual days basis at an annual rate of 8.75%, starting with the first billing and up to the date of the first repayment of principal on the credit. The interest during construction shall be paid through a direct transfer twice a year on June 30 and December 31 of each year.

- 4 -

5.6. The BORROWER shall obtain an order in favor of the LENDER granting the Zairian government's guarantee of this Credit Agreement in a form acceptable to the LENDER.

5.7. In addition, the BORROWER shall obtain, in favor of the LENDER, a transfer guarantee to be issued by the Banque du Zaire, covering the full repayment of the credit extended, including the interest owed during the construction period and the interest on the principal borrowed.
This guarantee, the form of which shall be acceptable to the LENDER, shall be provided within 30 (thirty) days of the signing of the commercial contract.

## ARTICLE 6 – TAXES, FEES AND MISC. EXPENSES

This Credit Agreement is subject to the general exemption tax scheme. Any expenses (taxes, social security taxes or related expenses) which are taxable in the Republic of Zaire shall be borne exclusively by the BORROWER during the entire time that the project is carried out and the credit is being repaid.

## ARTICLE 7 – ARBITRATION AND APPLICABLE LAW

Any dispute or disagreement arising from this Credit Agreement shall be subject to a prior amicable settlement between the parties.
Disputes arising from the interpretation or enforcement of this Credit Agreement shall be definitively settled according to the conciliation and arbitration rules of the International Chamber of Commerce of Paris by the Board of Arbiters designated in accordance with these rules.
The place of arbitration shall be Paris (France) and the arbiter shall apply Swiss law.

## ARTICLE 8 – EFFECTIVE DATE OF THIS CREDIT AGREEMENT

This Credit Agreement shall take effect subject to fulfillment of the following conditions:

8.1. signing of the Credit Agreement by both contracting parties

8.2.    signing of a commercial contract pertaining to the completion of the projects referred to in paragraphs 1.1., 1.2. and 1.3. of Article 1

8.3.    procurement of the permits required by the competent Zairian and Yugoslavian authorities, of which the contracting parties shall inform each other in writing

8.4.    provision of the 15% advance payment referred to in paragraph 4.1. and issuance of the advance payment guarantee in accordance with paragraph 4.2. of Article 4

8.5.    receipt by the LENDER of the duly signed bills of exchange and delivery to Privredna Banka Sarajevo

8.6.    provision to the LENDER of the order granting the guarantee by the Zairian government, as provided by paragraph 6 of Article 5

8.7.    provision to the LENDER of the transfer guarantee referred to in paragraph 7 of Article 5

8.8.    provision of the advance payment upon signature of the commercial contract for local expenses, as specified, along with the due date, in the commercial contract

If the above conditions are not fulfilled within 6 (six) months of the date on which the Credit Agreement is signed, this Credit Agreement shall be considered null and void, without this entailing any obligations or liability on the part of the parties.


ARTICLE 9 – CONSISTENCY

This Credit Agreement is drawn up in French and in eight equally valid original copies.

Executed in Kinshasa on

For the LENDER                                    For the BORROWER


The Chairman of the Business Committee          The General Deputy Chairman
     of ENERGOKOMERC                                  of S.N.EL.
     [signature]                                      [signature]
     Mr. Hakija TURAJLIC
     2/8/86

[see original for page in English]

# INTERNATIONAL COURT OF ARBITRATION

## CASE No. 11442/KGA

### ENERGOINVEST DD

**(Bosnia-Herzegovina)**

vs.

## 1. DEMOCRATIC REPUBLIC OF THE CONGO
**(Formerly Republic of Zaire)**

**(Dem. Rep. of Congo)**

## 2. SOCIETE NATIONALE D'ELECTRICITE (S.N.EL.)

**(Dem. Rep. of Congo)**

This document is an original of the award handed down in accordance with the Regulations of the ICC International Court of Arbitration.

1

# INTERNATIONAL COURT OF ARBITRATION
## OF THE
### INTERNATIONAL CHAMBER OF COMMERCE

## CASE No. 11442/KGA

**ENERGOINVEST DD**

Hamdije Cemerlica 2, 71000 Sarajevo (Bosnia-Herzegovina)

represented by Attys. Brenno Brunoni and Andrea Molino, "Spiess Brunoni Pedrazzini Molino," Via Pioda 14, CH 6900 Lugano (Switzerland), as well as by Attys. Danforth Newcombe, Peter Griffin, and Barbara Diggs, "Shearman & Sterling," 114 Av. des Champs-Elysées, F 75008 Paris (France)

-Claimant-

**versus**

**1. DEMOCRATIC REPUBLIC OF THE CONGO**

(formerly Republic of Zaire)

in the person of H.E., the Minister of Justice and Guardian of the Seals of the Democratic Republic of the Congo, Palais de Justice, Place de l'Independence, Kinshasa-Gombe (Democratic Republic of the Congo), not appearing

-Respondent No. 1-

**and**

**2. SOCIETE NATIONALE D'ELECTRICITE (S.N.EL.)**

2831 Avenue de la Justice, Kinshasa-Gombe (Democratic Republic of the Congo)

represented by Attys. Daniel Fauquet and Didier Joseph, "CSM Bureau Francis Lefebvre," 1-3 Villa Emile Bergerat, F 92522 Neuilly-sur-Seine, Cedex, Paris (France)

-Respondent No. 2-

## FINAL AWARD

## I – THE FACTS

1. On February 8, 1986, a contract was signed by and between the Republic of Zaire (now known as the Democratic Republic of the Congo) and the Yugoslavian company ENERGOINVEST for the execution of the hydroelectric facility on the Ubangi, in Mobayi (*"Mobayi"* project). This contract involved the studies, supplying, installation and startup:

   – of hydro-mechanical, mechanical, and electrical equipment for the generating plant (with the exception of turbo-alternator generators);

   – of a 30 KV line providing the connections from the substations to Gbadolite, Presidence, and the Airport.

   – the aforesaid substations;

   – the distribution at 6.6 KV within the city of Gbadolite.

2. On the first page of this contract, the Zairian party to the contract was referred to as follows: *"The Republic of Zaire, Contracting Authority, duly represented by SOCIETE NATIONALE D'ELECTRICITE, abbreviated as S.N.EL. [. . . ] hereinafter called S.N.EL. or CONTRACTING AUTHORITY [. . . ]"*

The company ENERGOINVEST is referred to therein as *"THE CONTRACTOR."*

Nevertheless, on page 2 of the contract, S.N.EL. is mentioned as being *"the Contracting Authority's instrument for execution,"* and in Article 2, the subject of which is *"Definitions,"* the contract is defined in the following manner:

*"Contract refers to the present contract executed between the CONTRACTING AUTHORITY and the CONTRACTOR, including the exhibits."*

3. The total amount of the contract, for the part in US$, is indicated as in the amount of US$18,000,000, with variations remaining possible due to the effect of supply changes, differences in quantities, as well as due to the effect of the application of the price revision formula.

In fact, the contract dated February 8, 1986, appears to have been amended and supplemented by several amendments in the exhibits that follow.

4. The contract's terms of payment provided for 15% to be paid as a down payment within 30 days of the signing of the contract, and for 85% to be paid by charging against a credit that was said to be "agreed," but for which the Agreement was not signed in actuality until one month later.

5. The Credit Agreement for the "*Mobayi*" project bears the date of March 4, 1986, and it was executed between the Republic of Zaire and Sociéte Nationale d'Electricité, S.N.EL., party of the first part, and the company ENERGOINVEST Ro Energokomerc, on behalf of Ro Energoinzenjering, party of the second part.

Since Ro Energocomerc and Ro Energoinzenjering were subsequently absorbed by the company ENERGOINVEST, the Yugoslavian party to the different contracts, including the Credit Agreement, is referred to in this award solely under the name of ENERGOINVEST.

6. The Credit Agreement "[. . . ] *regards a commercial and financial transaction, the amount of which is US$26,500,000*" (Article 2.1).

7. The credit is granted for a term of 10 years at an interest rate of 8.75% per year (Article 2.2).

8. The "Lender" (i.e., ENERGOINVEST) undertakes to finance 85% of the total amount of the studies, supplies, and services necessary for the execution of the project, that is, US$22,525,000 (Article 2.3).

9. The recitations of the Agreement indicate that: "*The Republic of Zaire has mandated Société Nationale d'Electricité, S.N.EL., for purposes of proceeding with the Mobayi hydroelectric facility and executing*

*the contracts allowing for successful completion of said mandate with the parties involved.*"

10. In accordance with said recitations, Article 3.1 of the Agreement provides that "*for the execution of the investments provided,*" S.N.EL. "*must execute commercial contracts with ENERGOINVEST.*"

11. The "*Financing Terms*" are governed in detail by the Agreement (Article 5), and they provide in particular that for repayment of the credit the lender shall issue bills for principal and interest, which will be "*drawn on S.N.EL.*" and "*endorsed by the Government Commissioner who has Finance among his duties.*"

12. It is also provided (Article 5.6) that "*the Borrower must obtain an order in favor of the Lender granting a guaranty by the Zairian Government for the present Credit Agreement, in a form acceptable to the Lender.*"

13. The Credit Agreement is signed "*For the LENDER*" by ENERGOINVEST and "*For the BORROWER*" by the Government Commissioner of Finance and Budget (representing the Republic of Zaire), as well as by S.N.EL.

14. The ratification of the Credit Agreement was authorized by Ordinance-Law No. 86-038 of the Republic of Zaire, dated April 5, 1986, and it took place the same day by act of the President of the Republic.

15. The bills intended for coverage of the financing, as provided in the Credit Agreement, were regularly issued by ENERGOINVEST, accepted by S.N.EL., and endorsed by the Government Commissioner for Finance and Budget, in the name of the Republic of Zaire.

16. The total bills for the principal amounted to US$15,300,000, and the total bills for the contractual interest amounted to US$7,026,408.53.

17. Subsequent to the default on performance of repayment of the loan under the terms agreed, on March 2, 2001, ENERGOINVEST filed a Motion for Arbitration against the Democratic Republic of the Congo and against S.N.EL. This Request made reference not only to the Credit Agreement, but also to a letter by the Minister of Finance of the Republic of Zaire dated March 4, 1991, which acknowledged the debt with ENERGOINVEST.

18. Despite the debtors' default, the work was performed by ENERGOINVEST and was not the subject of any complaint by the Zairian Government and/or by S.N.EL.

## II – THE ARBITRATION PROCEDURE

19. On March 4, 2001, the company ENERGOINVEST (hereinafter "Energoinvest" or "Claimant") filed a Motion for Arbitration before the International Court of Arbitration of the International Chamber of Commerce against the Democratic Republic of the Congo (hereinafter "DRC" or "Respondent No. 1") and Société Nationale d'Electricité of the Democratic Republic of the Congo (hereinafter "S.N.EL." or "Respondent No. 2).

20. The Motion for Arbitration was based on the Credit Agreement dated March 4, 1986, and on the debt acknowledgement by the Ministry of Finance of the Republic of Zaire in its letter dated March 4, 1991. It was accompanied by a file containing seven documents, and the Claimant's pleadings were that the two Respondents should be ordered jointly and severally to make payment to it in the amount of US$18,073,746.78, plus interest at the conventional rate of 8.75% a year, calculated from each due date in

arrears, as well as to pay the arbitration costs, including the costs of its defense.

21. The arbitration clause invoked by the Claimant is the one under Article 7 of the Credit Agreement, which is worded in the following manner:

"*Any disagreement or dispute deriving from the present Credit Agreement shall previously be submitted for an amicable settlement between the parties.*

"*Any disagreements deriving from the interpretation and application of the present Credit Agreement shall be settled finally in accordance with the Conciliation and Arbitration Regulations of the International Chamber of Commerce of Paris by the Panel of Arbitrators named in accordance with these Regulations.*

"*The place of arbitration shall be Paris (France), and the arbitrator shall apply Swiss law.*"

22. In its request, the Claimant mentioned that a similar contract between the same parties was signed on April 2, 1980, for the financing of another hydroelectric project (a project known as "*Katana-Goma*"), and that the Respondents were also in default with regard to this second contract. Since this default was the subject of a concurrent but separate arbitration proceeding, registered at the ICC International Court of Arbitration under No. 11441/KGA, the Claimant initially requested the joinder of the two arbitration proceedings.

23. Neither of the two Respondents responded to the Motion for Arbitration within the time period set for them by the Court pursuant to the Regulations.

24. On May 7, 2001, the Court's Secretariat informed the parties that absent the submission of any Reply by the Respondents within the established time period, the case was going to be submitted to the Court at one of its upcoming sessions, in order for it to decide whether to get the arbitration proceeding underway

in accordance with Article 6(2) of the Regulations. In the same notice, the parties' attention was drawn to Article 6(3) of the Regulations, pursuant to which: "*If one of the parties refuses or refrains from taking part in the arbitration or at any stage thereof, the arbitration shall take place notwithstanding this refusal or this abstention.*"

25. During its session on May 18, 2001, the International Court of Arbitration adopted the following decisions:

- not to join this case to case 11441/KGA;
- to get the procedure underway in accordance with Article 6(2) of the Regulations (all while considering the "*prima facie*" existence of an arbitration agreement between the parties regarding the Regulations, except that it would be up to the Court to rule on its own competence);
- submit this case to a Court of Arbitration of three members;
- confirm Atty. Marc Ronca, of the Law Firm of Schellenberg Wittmer of Zurich, Switzerland, in the capacity of co-arbitrator at the Claimant's suggestion;
- grant the Respondents 15 days to jointly appoint a co-arbitrator, absent which a co-arbitrator shall be named by the court in their place and stead in accordance with Article 9(6) of the Regulations;
- take the necessary measures for the appointment of the President of the Court of Arbitration;
- set the advance for arbitration costs at US$322,000, subject to subsequent adjustments, while inviting the parties to settle this advance at the rate of US$161,000 to be borne by the Claimant and US$161,000 to be borne by the Respondents.

26. By means of a letter dated June 1, 2001, sent to the ICC International Court of Arbitration and for information to the Minister of Energy of the Democratic Republic of the Congo and to the Claimant's Board, S.N.EL. made

its wish known to find a negotiated solution to the dispute, while expressing the opinion that the ICC International Court of Arbitration would not be competent to decide on the case, since *"[r]ecourse to settlement through conciliation and arbitration by the International Chamber of Commerce does not imply the parties' acknowledgement as a matter of law of the competence of the International Court of Arbitration or the institution of a Court of Arbitration by the aforesaid Court."*

27. By means of a letter dated August 3, 2001, sent to the ICC International Court of Arbitration and for cognizance to the Claimant's Board, the Minister of Justice and Guardian of the Seals of the Democratic Republic of the Congo made it known that his Ministry had jurisdiction to represent the Congolese Government in the arbitration proceeding and proposed having discussions with the Claimant in order to search for an amicable settlement of the dispute.

28. By means of a letter dated October 31, 2001, the Claimant informed the ICC International Court of Arbitration that negotiations aimed at an out-of-court agreement had failed, and it requested the continuation of the arbitration proceeding.

29. On November 23, 2001, the Court's Secretariat informed the parties that given that the Respondents had not proceeded with the joint appointment of a co-arbitrator, the Court had decided to name Atty. Mohamed Abu-Samra, of Khartoum, Republic of Sudan, as co-arbitrator, in their place and stead, in accordance with Article 9(6) of the Regulations.

30. On December 28, 2001, the Court's Secretariat informed the parties that during its session on December 14, 2001, the Court had named Atty. Renato Roncaglia of Geneva, Switzerland, as President of the Court of Arbitration, upon the nomination of the Italian National Committee and that, in this manner, the Court of Arbitration

was entirely formed and that the case file had been sent to it. The venue for the arbitration was confirmed to be Paris, France, as chosen by the parties in the arbitration clause.

31. On January 29, 2002, the Court of Arbitration sent the parties a draft Terms of Reference, drafted on documents, in accordance with Article 18 of the Regulations, and invited them to send in their comments and suggestions within a time period of 15 days.

32. The Claimant submitted certain comments dated February 13, 2002, while the two Respondents did not send any comment to the Court of Arbitration. Nevertheless, on January 30, 2002, S.N.EL. sent a letter (almost certainly written prior to the receipt of the draft Terms of Reference) to the Court of Arbitration. In this letter, S.N.EL. did not give any answer to the Claimant on the substance of the case but simply limited itself to requesting the joinder of this proceeding with the other arbitral proceeding taking place between the same parties (entered at the ICC Court under No. 11441/KGA), as well as to wishing that the Court would schedule hearings that the parties could attend.

33. By its Order dated February 21, 2002, the Court of Arbitration informed the parties that it was not possible for it to rule on the motion for joinder of the two arbitration proceedings, since Respondent No. 1 had not stated its agreement on this matter, and at the same time, it sent the parties the final draft of the Terms of Reference and invited them to sign it and return it prior to March 20, 2002.

34. Only the Claimant signed the Terms of Reference within the time period mentioned above.

35. Meanwhile, since the Respondents had not paid their part of the advance for arbitration costs, the entirety of the aforesaid advance (i.e., US$322,000) was paid by the Claimant, as the Court's Secretariat duly noted to it in its notice dated March 18, 2002.

36. On April 17, 2002, the Terms of Reference signed by the Claimant and by the Court of Arbitration were sent to the Court for approval in accordance with Article 18(3) of the Regulations.

37. The Terms of Reference were approved by the Court during its session on May 17, 2002, and they were subsequently sent by the Court's Secretariat to the Respondents with an invitation for them to sign it.

38. By an Order dated May 23, 2002, the Court of Arbitration granted the parties a time period until June 28, 2002, in order for the Claimant to set forth its claim and complete its submissions as it had requested, and also for the Respondents to respond to the Motion for Arbitration, something that they had not yet done. In the same Order, an additional time period until July 26, 2002, was granted to the Claimant for a possible reply to the answer by the Respondents (if any such answer was submitted), and the Respondents were granted until August 23, 2002, for a counterclaim to the possible reply by the Claimant. After this, the Court of Arbitration made reservation for setting a procedural hearing in Zurich in order to give the parties the opportunity to better illustrate their respective submissions and thus to decide, after a hearing of the parties, on the possible admission of other means of proof, as well as more generally on the follow-up to be given to the proceeding.

39. By means of a letter dated May 28, 2002, Respondent No. 2 sent the Court of Arbitration a copy of the Terms of Reference duly signed by it, and it served notice of its

intention to take part in the arbitral proceeding if a hearing for the parties to appear was set by the Court of Arbitration and notice thereof was served on it at least 30 days in advance, accompanied by an invitation personally addressed to the signer of the letter, Mr. Alphonse Muyumba Kelenge, Chairman of the Provisional Management Committee of S.N.EL., as well as to Mr. Loliki M'Bembe, head of the S.N.EL. Legal Division.

40. On June 14, 2002, the Court's Secretariat informed the parties of the receipt of the Terms of Reference signed by Respondent No. 1.

In this manner and albeit in successive stages, the Terms of Reference were finally signed by all of the parties.

41. Meanwhile, the Court of Arbitration adopted a provisional timetable for the arbitral proceeding and informed the parties, as well as the Court's Secretariat thereof (notice dated May 3, 2002). The latter sent the provisional timetable to the Court during its session on May 31, 2002 (notice dated May 31, 2002).

42. Within the time period stipulated by the Order dated May 23, 2002 (that is, as stated, prior to June 28, 2002), the Claimant submitted its statement of claim, accompanied by a file of documents, as well as the written statements made by the three witnesses.

43. In this claim, ENERGOINVEST's pleadings are set forth as follows:

*"In conclusion, the Claimant requests that the Court of Arbitration hand down an award:*

   *i)    ordering the Respondents to pay the Claimant, jointly and severally, the amount of 18,430,555.54 dollars plus interest*

*at the contractual rate of 8.75%, accruing as of the due date of each installment and until actual payment;*

ii)   *ordering the Respondents to pay, jointly and severally, to the Claimant the costs for the arbitration proceeding (including attorneys' fees, internal costs, experts' fees, and other accessory expenses);*

iii)   *plus interest on the amounts granted at the respective interest rate;*

iv)   *granting any other claim by Energoinvest that the Court deems appropriate."*

44. The two Respondents did not submit any reply to the Motion for Arbitration within the time period set by the Order dated May 23, 2002. Nevertheless, taking into account the letter from S.N.EL. dated May 28, 2002, requesting that a hearing be called, by an Order dated July 3, 2002, the Court of Arbitration set a hearing between the parties for September 12, 2001, at 10:00 a.m. in Zurich, at the headquarters of the law firm of Schellenberg Wittmer.

45. By a letter dated July 12, 2002, addressed to the Court of Arbitration, S.N.EL. justified itself for not having filed a reply to the Motion for Arbitration, saying that it thought that it had to wait for the claim to be better specified and for the submission of documents to be completed and that, furthermore, it had encountered comprehension difficulties due to the fact that the claim, as well as certain documents were in the English language. For these reasons, it requested that it be granted a new deadline.

46. By an Order dated July 18, 2002, the Court of Arbitration decided that it could not grant a new deadline to S.N.EL., a deadline which would not in any manner change the fact that it did not make its reply to the Motion for Arbitration known until the hearing on September 12, 2002,

a hearing which was set, among other things, precisely to "[. . . ] *give the Respondents an additional chance to express themselves and to actively take part in the proceeding."*

47. By means of the same Order, the Court drew the parties' attention to paragraph G-3 of the Terms of Reference, pursuant to which:

*"The arbitration language shall be the French language.*

*The Claimant shall be authorized to utilize the English language in its submissions, but in this case, if the Respondents so request, it must provide the Respondents with a certified translation into the French language.*

*The documents produced by the parties and the originals of which are drafted in a language other than the French language or the English language must be accompanied by a certified translation in the French language."*

The Claimant was invited to abide by this provision.

48. On July 22, 2002, the Court's Secretariat informed the Court of Arbitration and the parties of the receipt of a letter whereby Attys. Didier Joseph and Daniel Fauquet of the law firm of CMS Bureau Francis Lefebvre in Paris served notice of their having assumed representation of Respondent No. 2 and requested a time period of two months to respond to the Motion for Arbitration.

49. In the same notice, the Court's Secretariat also took note that the Claimant's representation is now being handled not only by Attys. Brenno Brunoni and Andrea Molino, of the law firm of Spiess Brunoni Pedrazzini Molino in Lugano, Switzerland, as indicated in the Motion for Arbitration, but also by Attys. Danforth Newcomb, Peter Griffin, and Barbara Diggs of the law firm of Shearman & Sterling in Paris.

50. By an order dated July 26, 2002, the Court of Arbitration upheld its previous Order dated July 18, 2002.

51. On September 12, 2002, a hearing was held in Zurich in which the Counsels of the Claimant and the Counsels of Respondent No. 2 took part.

Respondent No. 1 took no part in the hearing in any manner.

On that occasion, Counsels of Respondent No. 2 submitted to the Court, and to Claimant's Counsels, a brief along with documents.

Throughout the hearing, both the parties who were present had the opportunity to make their respective arguments and to discuss what would happen next in the proceeding. At the end of the hearing and with the agreement of the parties, the Court decided:

- to give the Claimant an extension until October 4, 2002, for submission of its reply to the brief by Respondent No. 2;

- to give Respondent No. 2 a later extension until October 25, 2002, for submission of its reply;

- to give both parties a later extension until November 5, 2002, to inform the Court of Arbitration whether a continuance of the preliminary investigation of the case was possibly desirable, the reasons for said continuance, and the means;

- to schedule a hearing for the case in Paris on December 10 and 11, 2002, in the absence of a request for a continuance of the case.

52. On October 4, 2002, Claimant presented its reply to the statement of the case, along with four documents.

53. On October 25, 2002, Respondent No. 2 presented its reply along with thirty documents.

54. None of the parties requested a continuance of the case.

55. The hearing to plead the case in the presence of the Court of Arbitration was held as scheduled on December 10, 2002, at the headquarters of the International Court of Arbitration of the ICC in Paris, with the participation of:

   – Attorneys Andrea Molino, Peter Griffin, and Susy Pedrinis for the Claimant;

   – Attorney Didier Joseph for Respondent No. 2;

   – Mr. Loliki Mbembe, head of the Legal Division of the S.N.EL.

No one attended on behalf of Respondent No. 1.

56. As no preliminary matters were raised, Counsels of the parties who were present presented arguments and counterarguments. They also remitted to the Court a written summary of their written arguments and conclusions.

57. In particular, Respondent No. 2 stated that, aside from any questioning of, reason for, or argument against its defense, said Respondent did not contest either the amounts demanded by Claimant [wording slightly different but translation is the same into English], or the deadlines of the dates after which interest was being claimed (see Brief of December 13, 2002).

58. At the end of the hearing, the Court declared the proceedings closed pursuant to Article 22 (1) of the Regulations. On December 13, 2002, the Court had the record of the hearing sent to the parties and the Court Secretariat. None of the parties made any comments regarding the record.

## III – THE PARTIES

### A. ENERGOINVEST

59. The **ENERGOINVEST** company, Claimant, is an engineering company founded in 1951, whose corporate headquarters are in Sarajevo (Bosnia-Herzegovina).

60. The documentation that the Claimant presented regarding its business shows that it is a well-known company with a proven international track record, acting in several engineering fields with a specialization in the electric power field, and specifically in the design and construction of electric power stations, high-voltage transmission lines, and electrical equipment.

61. It is not surprising that the Republic of Zaire, at the time it decided to invest in developing its hydroelectric resources and modernizing its infrastructure, including high-voltage electrical power transmission lines and power stations and the distribution of electric power, turned to ENERGOINVEST. This is even more so the case since ENERGOINVEST's proposition was not only trustworthy from a technical point of view but was also undoubtedly very interesting to the Republic of Zaire from a financial point of view.

62. The Respondents never contested that ENERGOINVEST fulfilled its contractual obligations. The *Mobayi* project was indeed completed by ENERGOINVEST to their [*sic*] satisfaction [and ENERGOINVEST] did so despite the problems with repayment of the loan, which had already cropped up during execution of the works and which are the reason for this arbitration proceeding.

63. Through its statements and some of the documents that it has produced, Claimant did not forego pointing out to the Court of Arbitration the tragic events which occurred in Bosnia-Herzegovina and the very bad losses that it incurred directly and indirectly in the wake of these events. The Court of Arbitration expresses its sympathy in this regard, but it must also point out that these events are not related to the dispute which bring the parties to arbitration and that, consequently, in no way must they influence the court's decision. The decision shall be based exclusively on the analysis of the contractual relationship between the parties, the facts relating thereto and the rights and obligations arising therefrom, by enforcing the law that the parties have chosen to resolve their differences.

### B. DEMOCRATIC REPUBLIC OF THE CONGO

64. The **Democratic Republic of the Congo (DRC)** is the same State as the one named "Republic of Zaire" at the time the Credit Agreement and the contracts for the *Mobayi* project were signed with ENERGOINVEST. Indeed, the name of Democratic Republic of the Congo was the name initially given to this country in June 1960 when the Belgian Congo was proclaimed an independent State, but after General Mobutu seized power in 1970, the name was changed to "Republic of Zaire." When President Mobutu was overthrown in May 1977, his successor, President Laurent Kabila, gave the country back its former name, Democratic Republic of the Congo.

65. Consequently, should the Court of Arbitration, in this award, refer to the Republic of Zaire for the relevant period of time, the reference should in all cases be understood as a reference to the same State which today has the name

Democratic Republic of the Congo. In this case, there is not even the problem of the succession of states, as may be found under different circumstances; there has merely been a change of name of the same legal entity.

66. Even though the DRC is a State with major natural resources, among which is its hydroelectric potential, factors such as political instability, rebel movements, and infiltration of the country by military forces from neighboring countries such as Rwanda and Uganda have weighed heavily on the country's economy.

The Court of Arbitration understands the financial difficulties that can result for the DRC due to this, but, in the same way as was said with regard to ENERGOINVEST's economic situation, these events are devoid of any relationship with the factual and legal situation of the contractual relations between the parties at this arbitration, and the findings of this court must set them aside.

## C. THE SOCIETE NATIONALE D'ELECTRICITE
### [THE NATIONAL ELECTRICITY COMPANY]

67. The **Société Nationale d'Electricité (S.N.EL.)** is a "State-owned Company" [*société d'Etat*], as can be seen on its letterhead (see the numerous documents from the S.N.EL. produced by both the parties in this arbitration). Though it has legal autonomy, it is a company founded by the State in 1970 and which is wholly owned by it.

In particular, it is the state organization that is responsible for the generation, transmission, and the distribution of electric power in the country.

68. It is, therefore, completely logical, as set forth in the Credit Agreement of March 4, 1986, that the execution of the *Mobayi* project was entrusted by the State to S.N.EL. as "*loan beneficiary*" and "*project manager*" designated to sign commercial contracts with ENERGOINVEST.

## IV – JURISDICTION OF THE COURT OF ARBITRATION

69. During its session of May 18, 2001, the ICC's International Court of Arbitration decided, among other things, to set the arbitration procedure in motion pursuant to Article 6(2) of the Regulations, because it appeared *prima facie* that the parties, in their contractual relationship, are bound by an arbitration clause under the ICC Regulations.

70. The clause in question, which is referred to by ENERGOINVEST in its Arbitration Request, is the one incorporated into the Credit Agreement in Article 7 (see paragraph 21 of this award).

71. Respondent No. 2 did not contest the validity of the arbitration clause, and at the outset accepts the jurisdiction of this Arbitration Court.

72. Also pursuant to Article 6(2) of the Regulations and point D-1 of the Mission Act, this Court shall make a ruling on its jurisdiction regarding Respondent No. 1.

73. The DRC is undoubtedly a party to the Credit Agreement. The Agreement was signed by the State Finance and Budget Commissioner in his capacity as representative of the DRC, and it was ratified on April 5, 1986.

74. In the ratification instrument, which is signed by the President of the Republic of Zaire, one can read, among other things: "*We state that it is accepted, confirmed, and ratified, and we promise that it will be observed without breach*" (see Exhibit No. 4 attached to the Motion for Arbitration).

75. A *"Legal Opinion"* written by the *"Office of the President-Founder, President of the Republic"* (Exhibit. No. 5 attached to the Motion for Arbitration) ends with the following conclusion:

*"In witness whereof, the undersigned states and certifies:*

*1.1 that the Credit Agreement signed on March 4, 1986, between the ENERGOINVEST company, the Republic of Zaire, and the Société Nationale d'Electricité was validly entered into by a duly mandated person, to wit, Citizen DJAMBOLEKA LOMA OKITONGONO, State Finance and Budget Commissioner.*

*1.2 with regard to the Republic of Zaire, this agreement becomes a fully legal instrument pursuant to Order-Law No. 86-038 of April 5, 1986, through which it is authorized and pursuant to the ratification instrument with the same date:*

*1.3 that consequently, the Credit Agreement hereunder is, in form and substance, a completely valid and legal instrument binding the contracting parties irrevocably to its terms and stipulations."*

76. The arbitration clause (Article 7 of the Credit Agreement) calls for "Any disagreement or dispute [. . .] will be settled amicably first by the parties." Even if that is a condition for arbitration, it is certain that it was met. Over the years, ENERGOINVEST not only made constant efforts to obtain payment of debts but negotiations between the parties were held in Paris in September 2001, and it was only after the failure of these negotiations that ENERGOINVEST's counsels requested the Secretariat of the Court to set the arbitration procedure in motion (see letter of October 31, 2001).

77. The conclusions of the legal opinion referred to in paragraph 72 above, which comes from the Office of the President of the Republic of Zaire, therefore leaves no doubt as to the validity of the Credit Agreement as a binding contract binding irrevocably the three parties who signed [it], one of said parties being the Republic of Zaire.

The only outstanding issue that remains to be examined to eliminate any doubt regarding the jurisdiction of the Court of Arbitration regarding the DRC is therefore the issue of the possible immunity of the DRC by reason of its capacity as a Sovereign State, even though such exception was not mentioned during the arbitration procedure.

78. Respondent No. 1 was only involved in this procedure on two occasions:

-- the first was on August 3, 2001, in a letter sent to the ICC's International Court of Arbitration and to make itself known to Claimant's counsel, in which the Minister of Justice [and Keeper of the Seals] stated that his Ministry was competent to represent the Congolese State in the arbitration proceeding and offered to hold negotiations with the Claimant to seek an out-of-court settlement of the dispute.

-- the second time was on June 8, 2002, when the Minister of Justice [and Keeper of the Seals] signed and sent back to the Court the Mission Act, about which the Court informed the parties in its letter dated June 14, 2002.

79. The two instruments referred to above confirm, should that be necessary, that Respondent No. 1 was well aware of the existence of the Motion for Arbitration presented against it by the Claimant and that Respondent No. 1 was informed at all times of what was occurring in the arbitration procedure. Respondent No. 1 was duly notified of all the [written] communications to the parties from the Secretariat of the Court, as well as all the Orders and all the [written] communications of the Court of Arbitration.

80. Aside from the fact that some jurisprudence—in particular French jurisprudence—views a Mission Act signed by parties as signifying acceptance by the parties to submit to arbitration (See Fouchard/Gaillard/Goldman, "Traité de l'arbitrage commercial international," pg. 687 and 688), said acceptance is in any case explicit in the arbitration clause that the DRC signed of its own will. The willingness of the DRC to submit possible disputes arising from the Credit Agreement to the arbitration jurisdiction of the ICC is clearly there, and it implies the waiver of the possible privilege of sovereign immunity.

81. The principle according to which acceptance of an arbitration clause by a State is valid and binding is a principle which has been broadly asserted as doctrine as well as by jurisprudence. A few examples:

Craig, Park and Paulsson – <u>International Chamber of Commerce Arbitration</u> – 3rd edition – para. 8.13, pg. 122: "*It is not necessary for States or their emanation to waive whatever sovereign immunity they may be entitled to in other contexts in order to effect valid submission to arbitral jurisdiction. An agreement to arbitrate is sufficiently binding in and of itself. It is increasingly rare that a State or a State entity even raises the defense of sovereign immunity before a court of arbitration.*"[1]

Redfern and Hunter – <u>Law and Practice of International Commercial Arbitration</u> - p. 319: "*During the course of arbitration proceedings to which a state is a party, the distinction between absolute and restricted immunity should be of no relevance. The arbitration can only proceed validly on the*

---

[1] Loose Translation: [same in English as paragraph with the (1)] "It is not necessary for States or their emanation to waive whatever sovereign immunity they may be entitled to in other contexts in order to effect valid submission to arbitral jurisdiction. An agreement to arbitrate is sufficiently binding in and of itself. It is increasingly rare that a State or a State entity even raises the defense of sovereign immunity before a court of arbitration."

basis that the state concerned has agreed to arbitrate; and such an agreement is generally held to be a waiver of immunity, absolute or restricted." [2]

Fouchard, Gaillard, Goldman – Traité de l'arbitrage commercial international – para. 642. pg. 404: "*The competence of the arbitrators to hear disputes that States or bodies of States which enjoy immunity have agreed to submit to them is unquestionable. It is a constant, indeed, that the beneficiaries of jurisdictional immunity may waive this immunity. Now the arbitration agreement, which directly contradicts immunity, is necessarily to be analyzed as a waiver by the State or the State's body in question to its [right to] jurisdictional immunity.*"

ICC Award – Case No. 2321 in 1974 – Recueil de sentence arbitrales CCI 1974-1985, pg. 10: "*The principle of pacta sunt servanda is generally acknowledged in international law . . . A sovereign State must be sovereign enough to make a binding promise both under international law and municipal law.*" [3]

Likewise: The ICC's award sentence in Case No. 1526 in 1968, Clunet 1974, 915, with a note by Yves Derains, as well as the ICC award in case No. 1939 in 1971, Rev. Arb. 1973, 122.

82. It may be added that, in the case in point, the sovereignty of the State does not come into play because the Credit Agreement on which the Claimant bases its claim is without doubt a contract of private law which could have been entered into by any private person.

---

[2] Loose Translation: "During the course of arbitration proceedings to which a state is a party, the distinction between absolute and restricted immunity should be of no relevance. The arbitration can only proceed validly on the basis that the state concerned has agreed to arbitrate; and such an agreement is generally held to be a waiver of immunity, absolute or restricted."

[3] Loose Translation: "The principle of pacta sunt servanda is generally acknowledged in international law . . . A sovereign State must be sovereign enough to make a binding promise both under international law and municipal law."

83. From a principle taken for granted in international arbitration cases, State immunity is not an absolute rule. One must distinguish between acts called *"jure imperii,"* that is, acts carried out by the State in the exercise of its sovereignty, and acts that are called *"gestionis jure,"* that is, acts carried out by the State in the domain of private law and which could be done by any private person. In other words, even if one admits that the actions of a State always aim to be in the public's interest, the criterion to be considered does not regard the aim of the actions but the type of actions they are in order to determine whether they arise from this sovereign power, which only the State has, or whether these are acts that any private person could perform.

84. The principle that is known as the restricted sovereignty principle and the distinction between *"jure imperii"* acts and *"jure gestionis"* acts on which it is founded have had ongoing recognition and been enforced under Swiss law, which is the law the parties mutually agreed to submit themselves to (Article 6 on the Credit Agreement). The enforcement of Swiss law was also confirmed in the Mission Act, which all the parties signed without reservation.

85. By way of example, a similar case may be recalled, which was tried by the Federal Swiss Court (hereafter: "FC") in 1989. A State in South America had at the time guaranteed two Claimant bank syndicates the repayment of funds for the purposes of financing two industrial development contracts. It was undeniable to the FC that the State had acted as a private person and that its commitment was no different from a commercial commitment that any private person could have made. [4]

---

[4] ATF 124 III, cons. 4.
In the same manner:
Judgment of the Swiss Federal Court of December 20, 1947 (ATF 73 III 158)
Judgment of the Swiss Federal Court of November 15, 1978 (ATF 104 1A 367)
Judgment of the Swiss Federal Court of March 21, 1984 (ATF 110 1A 43).

86. Switzerland is one of the countries which ratified the European Convention of the Immunity of States of 1972 [5] and the Convention, in Article 12(1), states precisely that a State may not claim immunity of arbitral jurisdiction when an arbitration agreement concerning disputes in civil or commercial matters has been signed.

**For all of these reasons, the Court rules that it has jurisdiction with regard to the Democratic Republic of the Congo as well as with regard to the S.N.EL.**


## V – CLAIMANT'S RIGHT TO PAYMENT OF THE CLAIMED AMOUNTS

87. In the conclusions it presented during the plea hearing before the closing arguments, the Claimant confirmed the conclusions of its Brief of June 28, 2002, in which it claimed payment of "*a total of US$18,430,555.54, plus interest at the contractual rate of 8.75% calculated from the due date of each payment until actual payment.*"

88. The basis for such a claim is the letter from the Finance Minister of the Republic of Zaire dated March 4, 1991 (Exhibit No. 6, attached to the Arbitration Request).

89. The letter in question had been sent by the Finance Minister to the Governor of the Banque du Zaire and copied to the Prime Minister, the Secretary of State for Finance, and for information purposes to ENERGOINVEST.

---

[5] RS 0.273.1

It noted the amount owed to ENERGOINVEST for the two projects the Yugoslavian company had been assigned, and of which it had financed 85% ("*Katana-Goma*" Project and "*Mobayi*" Project). In the tables attached to the letter, details were given on the arrears for each project. The letter ended with the Finance Minister's proposal to pay ENERGOINVEST a monthly sum of one million dollars "[. . .] *beginning January 1991, until complete discharge of these arrears and complete coverage of the agreed-upon regular payments.*"

90. Such letter states that the total amount owed to ENERGOINVEST for financing the "*Mobayi*" project was initially US$24,147,775.68, US$15,300,000 of which was principal (see Exhibit No. 34 attached to the Brief of June 28, 2002), US$7,026,408.53 of which was contractual interest (see Exhibit No. 34 attached to the same Pleading), and US$1,821,367.15 of which was interim interest (see Exhibit No. 2-D attached to the Brief of June 28, 2002).

91. ENERGOINVEST acknowledges that certain payments were made thereto between 1991 and 1992, although they arrived after the contractual due dates. It notes the total of these payments (see paragraph 73 of its Brief of June 28, 2002) at US$6,074,028.14 (which is in error, as will be demonstrated below), and it adds (see paragraph 75 of the same Pleading) that the amount outstanding was therefore reduced to US$18,073,747.10 (which is also in error).

92. To this latter amount it is necessary to add the sum of US$356,808.53, corresponding to the total delinquent interest due as a result of the delay after which the received payments were made (see Exhibit No. 36 attached to the Brief of June 28, 2002, or the letter of February 22, 1991, claiming the delinquent interest).

93. The total of US$18,430,555.54 appearing in the Claimant's conclusions must therefore be the result of adding the sum of US$18,073,747.10 to the sum of US$356,808.53 (which, again, is in error, because the total of such additional amount would be US$18,430,555.63).

94. In effect, the Claimant's calculations in paragraphs 72, 73, 74, and 75 of its Brief of June 28, 2002, contain several small material errors, specifically:
   – in the table of payments received (paragraph 73) the total of US$6,074,028.14 is in error. The exact total of the additional amount is US$6,074,028.74.
   – in the table in paragraph 75, the total initially due shows US$24,147,775.15, while the exact amount is US$24,147,775.68 (see paragraph 72);
   – in the same table in paragraph 75, the total payments received, which as noted are US$6,074,028.74 and not US$6,074,028.14, should be corrected;
   – as a result of all these corrections, the exact "Subtotal" in the same table will be US$18,073,746.94 and not US$18,073,747.10;
   – finally, if we add US$356,808.53 (delinquent interest), the total amount due (in the same table of paragraph 75) will be US$18,430,555.47 and not US$18,430,555.54.

95. The Court of Arbitration admits the amount due to the Claimant as being the total corrected amount mentioned above, i.e., US$18,430,555.47.

96. Since this amount was calculated in the letter from the Finance Minister of March 4, 1991, which has already been mentioned several times in this sentence, it may be said that the Democratic Republic of the Congo, in the person of its

Finance Minister, has acknowledged ENERGOINVEST's right to payment of this amount.

This debt is acknowledged under Swiss law (Article 17 CO). In order to be valid, it must be communicated to the creditor, which has already occurred, since a copy of the letter of March 4, 1991, has been officially forwarded to ENERGOINVEST.

97. With regard to the S.N.EL, its defense consists in saying that it is not a debtor, but it does not dispute the accuracy of the amount claimed by ENERGOINVEST. On the occasion of the plea hearing, it explicitly stated that, notwithstanding any other dispute, reason, or argument in its defense, it had no dispute regarding the sums claimed by the Claimant, nor regarding the due dates on the basis of which the interest is claimed (see the minutes of such hearing).

98. However, the Court of Arbitration notes that the total amount owed to ENERGOINVEST (i.e., US$18,430,555.47) consists of two different components: an initial component (US$18,073,746.94) corresponding to the total agreed-upon amount of principal and interest not paid by the contractual due dates, and a second amount (US$356,808.53) corresponding to delinquent interest due on payments that were made but which were, in fact, paid late. Consequently, because of the different nature of these two amounts, the Claimant is not entitled to add them together to claim that the contractual interest applies to the total.

This problem, which in effect relates to the claim for the payment of interest, will be considered subsequently by the Court in the section of this opinion relating to the claim for the payment of interest.

At present, once it has been established how much is owed to the Claimant, it will be necessary to determine who is (or are) the debtor(s).

## VI – DRC COMMITMENT

99. The DRC's commitment is beyond doubt. It is certainly party to the Credit Agreement of March 4, 1986, and as has already been noted (see Section IV of this sentence), it may not rely on its sovereign immunity.

100. Moreover, the Credit Agreement is certainly a commercial agreement that the State has freely negotiated and accepted during the course of an activity subject to private law ("*jure gestionis*") and not in the exercise of its sovereign authority ("*jure imperii*"). This is an agreement which, if the promise solemnly made by the President of Zaire in the act of ratification of the Agreement is to be complied with, "*will be unconditionally observed*."

101. It may be added that the letter from the Finance Minister dated March 4, 1991, to which reference is made several times in this sentence, is not merely an acknowledgement of debt, and therefore an acknowledgment of the State's default on its contractual obligations, but is also an additional confirmation of the State's commitment vis-à-vis ENERGOINVEST, since it ends with the request that the Finance Minister send to the Governor of the Banque du Zaire, as well as to the Prime Minister and the Secretary of State for Finance, that a monthly payment of one million US dollars be made in favor of ENERGOINVEST, "*by debit from the general Treasury account*."

102. S.N.EL itself, which (it must not be forgotten) is a "State-owned enterprise," does not dispute the DRC's liability. To the contrary: it maintains that the DRC alone is liable, which we shall see in the following section.

## VII – LIABILITY OF S.N.EL.

103. S.N.EL. asks the Court of Arbitration to adjudge that it is not liable for the obligation contracted by the State, and, consequently, that it should be cleared and that all claims made against it by ENERGOINVEST should be dismissed.

104. The arguments of S.N.EL. are as follows:

- o   It never had a "loan" but only an adjustment in the obligation to pay for construction services.
- o   The Credit Agreement has no legal autonomy: it depends on the main contract previously executed, of which it adjusts the terms of payment.
- o   In that contract, the Republic of Zaire is the sole contracting party of ENERGOINVEST; S.N.EL. is not a party to that contract, which it signed only as agent of the Republic of Zaire.
- o   The fact that S.N.EL. accepted the drafts drawn on it by ENERGOINVEST and backed by the State in conformity with the Credit Agreement does not signify a payment obligation for it, because it is a "drawing on behalf."

The Court of Arbitration will examine each of these arguments hereinafter.

105. The *"Mobayi"* project is certainly a large-scale project of public interest. Its nature as a project "of public utility" results very clearly from the Departmental Order dated June 14, 1986 (Exhibit No. 7 appended to the Brief of Respondent No. 2).

106. As usually occurs for such projects, it is entirely normal that the political and strategic decision of their execution is made by the State and that, for that purpose, the State takes charge not only of finding a supplier of services and equipment that can be trusted from a technical standpoint, but also and even first, finding someone who can grant a loan in an amount and for a term that enable the financing of the project.

107. In the case in point, the special nature of the contractual relations between the Republic of Zaire and S.N.EL., on the one hand, and ENERGOINVEST, on the other hand, consists of the fact that a single entity (ENERGOINVEST) performs the two functions of financial backer and technical contracting party for the engineering, deliveries and services. That is the reason that induces Respondent No. 2 to say that, ultimately, the Credit Agreement is nothing but an adjustment in the terms of payment for the supplies and services stipulated by the contract for executing the project (which contract it calls "main").

108. Such an argument is not defensible: the fact that the entities are identical in no way changes the legal and substantive autonomy of the two contracts.

109. It is certain that the parties wanted to give legal autonomy to the Credit Agreement, which already had substantive autonomy with respect to the execution of the project for which the financing was intended. They wanted to negotiate and sign an independent contract for financing the project, and it was for that purpose that they signed the Credit Agreement. If it was only a matter of adjusting the terms of payment for deliveries and services, we fail to see why they would not have done so within the contract concerning those same deliveries and services, in the contractual clause concerning the conditions of payment.

110. Obviously, there is a connection between the conditions of payment of the contract concerning the execution of the project and the Credit Agreement that procures the financial resources, such that the payment for the supplies and services, in the amount of 85%, is done (as we read in the contract that concerns them) *"by charging to the credit granted to the Prime Contractor by the Contracting Party."* But the Credit Agreement, to which reference is necessarily made in the conditions of payment for the supplies and services, is and remains clearly autonomous with respect to such contract: it is sufficient to consider that it is stipulated in the Credit Agreement that the repayment of the loan and the payment of the contractual interest be done by issuing drafts that are to be accepted by S.N.EL. and backed by the State. The right to issue those drafts, just as the obligation to accept them, to back them, and to pay them at the agreed-upon due dates, has nothing to do with the deliveries of supplies and services.

111. The amount of the financing stipulated in the Credit Agreement confirms also the autonomy of that Agreement. In fact, when it is said that ENERGOINVEST agrees to finance 85% of the total value in foreign currency of the supplies and services that will be defined in detail only in the commercial contracts, one does not yet know the value of those supplies and services, while the amount of the financing is already set at US$22,525,000.

As of the date at which the Credit Agreement was signed, the only contract for supplies and services that had been signed one month prior (the contract dated February 6, 1986) stipulated a charge to the credit of only US$11,301,522 (see Exhibit No. 1 appended to the Brief of Respondent No. 2). Riders to that contract were executed in the subsequent years, and the final amount of the financing reached US$15,300,000 (total amount of the drafts for the principal).

Since the Agreement had been signed and it was valid for a higher amount, that confirms its complete legal and substantive autonomy.

112. In other words, the Agreement dated March 4, 1986, includes practically, on the part of ENERGOINVEST, the granting of a line of credit to the Zairian counterpart. That line of credit, pursuant to ENERGOINVEST's commitment, may be as high as US$22,525,000. Payments for supplies and services are specifically charged to the line of credit (up to 85% of their value) as the commercial contracts are signed.

113. This is a fairly ordinary financing arrangement, which presupposes the stipulation of the Credit Agreement as an autonomous contract and the signing of specific contracts that are paid, to the extent agreed, by charging [them] to the line of credit.

114. Therefore, the autonomy of the Credit Agreement with respect to the contracts for purchase of equipment and services is indisputable.

115. Moreover, if the Credit Agreement were not a legally autonomous contract, there would have been no need for an official instrument of ratification of the Agreement by the President of the Republic of Zaire dated April 5, 1986, which was duly authorized by Ordinance-Law No. 86-038 bearing the same date. Such a procedure in matters of borrowing is entirely in accordance with the Zairian law of that time, as confirmed by the *"Legal Consultation"* rendered by the Office of the President of the Republic of Zaire dated May 7, 1986 (see Exhibit No. 5 appended to the Motion for Arbitration).

116. Once the legal autonomy of the Credit Agreement is established, and in view of the fact that the Motion for Arbitration is not based on the Contract dated February 8, 1986, but exclusively

on the Credit Agreement and on the recognition of debt in the letter from the Finance Minister dated March 4, 1991, there is no need to refer to the Contract dated February 8, 1986, to settle the matter. It is sufficient to see that S.N.EL. is a party to the Credit Agreement as co-borrower with the State of Zaire.

117. The statement made by S.N.EL. to the effect that it is not a party to the Credit Agreement is unfounded.

118. S.N.EL. is indeed expressly indicated as a party to that Agreement with the Republic of Zaire, party of the first part, and opposite ENERGOINVEST, party of the second part.

The fact that the Republic of Zaire is named *"BORROWER"* and that S.N.EL. participates in the Agreement *"as beneficiary of the credit"* does not in any way change the obligations toward ENERGOINVEST that derive from the Agreement.

119. In accordance with Article 18 of the CO: *"To evaluate the form and clauses of a contract, it is appropriate to look for the actual, common intent of the parties, without dwelling on the expressions or inaccurate names that they may have used [. . .]"*

120. In the context of the Agreement, the word "Borrower" is often used to designate S.N.EL.. For example:

   o   Article 3.2 speaks of a "Consulting Engineer chosen by BORROWER," while Article 2.c of the Contract dated February 8, 1986, states that the Consulting Engineer *"was designated by the Prime Contractor,"* i.e., by S.N.EL., which is entirely logical in this type of contract;

   o   Article 4.1 speaks of payment obligations borne by BORROWER, they being obligations

undertaken by S.N.EL. in the Contract dated February 8, 1986, which in reality were actually fulfilled by S.N.EL. (see the documents of payments received that have been produced by the Respondent, Exhibit No. 12-A *et seq.*, which are appended to the Statement in Case;

o   Article 3.6 speaks of the BORROWER's obligation to obtain an order in favor of the LENDER granting the guaranty of the Zairian State, an obligation clearly placed upon S.N.EL.

121. S.N.EL. signed the Agreement "For the Borrower," just below the signature of the representative of the Republic of Zaire.

122. The Court is persuaded that ENERGOINVEST's intent when the Credit Agreement was signed was to have, opposite it, two subjects who were jointly and severally bound for repayment of the loan that it was granting. Consequently, it is logical to think that the Zairian State and S.N.EL. agreed to assume such a joint and several obligation by the joint signing of that Agreement.

123. S.N.EL.'s commitment to accept the drafts and to have them backed by the State is a subsequent confirmation of its direct liability.

124. Since the project, as stated, was of *"public utility,"* it is very possible that the State was responsible for making the funds available for repayment of the credit. Nevertheless, for the State, it was a matter of making the funds available to S.N.EL. so that it could pay ENERGOINVEST, which in no way changes the obligational relationship between those parties.

125. This is precisely where we find the major weakness of the argument of Respondent No. 2.
It is sufficient to look at all the documents that it has produced as appendixes to its Brief in Reply. They are correspondence or documents internal to the Government of Zaire, from which it is easy to reconstruct the following scenario: the State does not have sufficient funds to repay the loan; S.N.EL. is very concerned because ENERGOINVEST is asking to be paid and there is a risk that the work will be suspended or, in the best case, delayed; ENERGOINVEST intervenes not only with S.N.EL. but also with the agencies of the State; and unfortunately, any effort seems useless because the due dates of the payments are accumulating and the payments are not being made.

126. Conversely to what Respondent No. 2 is claiming, such a situation does not mean that only the State is liable toward ENERGOINVEST. Here there is a clear confusion between the nature of the relationship between S.N.EL. and the State (which does not concern us) and the nature of the relationship between S.N.EL. and ENERGOINVEST, which is the subject of this arbitration.

127. It is very possible that, in the internal relations between S.N.EL. and the State, the State is the one that is supposed to procure the funds for repaying the debt to ENERGOINVEST. It is not up to this Court to determine that. In any event, it is certain that S.N.EL. and the State were both bound toward ENERGOINVEST. The fact that ENERGOINVEST intervened directly with the State is very normal, since the State is one of the debtors, but that does not signify any waiver by ENERGOINVEST of its rights toward S.N.EL. or, as Respondent No. 2 is claiming, an acknowledgment by ENERGOINVEST that solely the State is liable.

128. We have already said that, once the commitment of S.N.EL. was established based on the Credit Agreement, the talks that were conducted about the Contract dated February 8, 1986, do not need to be taken into consideration by this Court.

In reality, S.N.EL. did try to introduce such talks based on the allegation (which we have already declared false) according to which the Credit Agreement does not have any autonomy, and we must refer to the Contract dated February 8, 1986, to establish the nature of the relationship between the parties.

129. The Court considers it necessary to rule on two of the questions raised by that contract:

- o First, the contract in question is not signed by S.N.EL. only for and on behalf of the State. It signed it also as *"Prime Contractor,"* and a whole series of obligations in that contract is undertaken by the *"Prime Contractor"*;

- o Second, the assertion in Article 2.b to the effect that: *"The obligations attributed to the Prime Contractor by this Contract must be construed as obligations of the Executive Council of the Republic of Zaire"* does not mean, as Respondent No. 2 claims, that only the State is liable for performance of those obligations, but that the obligation of the State *("Contracting Authority")* is added to the obligation of S.N.EL. *("Prime Contractor").*

130. The above two points are important because they provide confirmation that:

- o the "substitution" of S.N.EL. for the State "for making the investments," which is at issue in Article 3.1 of the Credit Agreement, does not entail an exclusion of any

commitment of S.N.EL., but means to the contrary that S.N.EL. is mandated by the State to assume all obligations that must be assumed "for making the investments" to be started by the signing of the commercial contracts;

o   the signing of the commercial contracts by S.N.EL. does not exclude the liability of the State, but, on the contrary, the State confirms its joint and several liability with S.N.EL. not only with respect to the Credit Agreement but also with respect to the commercial contracts.

Therefore, we will take up these two arguments in the next Section, which deals precisely with the joint and several liability of the debtors.

## VIII - JOINT AND SEVERAL LIABILITY

131. ENERGOINVEST is asking that the two Respondents be jointly and severally ordered to pay it the amounts claimed. According to it, the Credit Agreement clearly shows that the Government and the S.N.EL. jointly committed to repay the loan that was given them by ENERGOINVEST, which, moreover, corresponds to the intention and interest of ENERGOINVEST.

132. Furthermore, ENERGOINVEST believes that the two Respondents had agreed to combine efforts for realization of the project, and did so to achieve a common goal, which, pursuant to Articles 530 et seq. of the CO, is the conduct that generates a simple partnership, which implies joint and several liability of its members (Article 544 of the CO).

133. The S.N.EL. objects to these arguments and maintains that there is no joint and several liability between it and the Government for the following reasons:

- o   There is no clause in the Credit Agreement that commits it to the debt.

- o   Joint and several liability is not assumed under Swiss law. It must result from an explicit declaration, absent which ". . . *joint and several liability shall only exist in cases prescribed by law*" (Article 143 of the CO).

- o   Collaboration between the Respondents does not signify the existence of a simple partnership because in the case in question there was no commingling of contributions by each of the intended partners; thus the parties were not on an equal footing with regard to the project, and their goals, even if they did converge, do not constitute a common goal.

134. Article 1044, paragraph 1 of the Code of Obligations prescribes that "*anyone who draws, accepts, endorses, or guarantees a bill of exchange is jointly and severally liable to the bearer.*" The drafts intended for repayment of the loan were accepted by the S.N.EL. and guaranteed by the DRC; thus they are jointly and severally liable.

Furthermore, the Court of Arbitration observed that even if joint and several liability were not assumed under Swiss law, the intention to make a joint and several commitment need not result from an explicit (written) declaration. Exclusion of the assumption simply means that the fact that an obligation is undertaken jointly by a plurality of entities does not have the automatic legal consequence of their joint and several liability for such an obligation. However, the *intention of a plurality of entities to bind themselves jointly and severally need not be expressly declared*; it is sufficient for such an intention to result tacitly from other manifestations (cf. ATF 116 II 712; ATF 49 III 205).

135. The Court of Arbitration ascertained that the intention of the Republic of Zaire and the S.N.EL. to obligate themselves jointly and severally resulted, in particular, from:

- o   The fact that the S.N.EL., as has already been established, is a party to the Credit Agreement, and is so practically in the capacity of a co-borrower ("beneficiary of the credit").

- o   The fact that the prescribed form for repayment of the loan by the parties in the Credit Agreement, i.e., issuance of drafts that the S.N.EL. undertakes to accept and the Government undertakes to guarantee, is one confirmation of joint and several liability of the obligation contracted by the Government and the S.N.EL.

- o   The fact that the obligations contracted by the S.N.EL. as "Prime Contractor" are also to be considered as obligations of the Republic of Zaire.

- o   The fact that payments in execution of the obligation to repay the loan were effected by the S.N.EL.

- o   The fact that the conduct of the Government and the S.N.EL. with regard to repayment of the financing granted by ENERGOINVEST fully justifies the fact that the latter considered them jointly and severally liable, even on the basis of the principles of good faith and trust, which are the basic principles of Swiss law on obligations.

136. For all of the above reasons, the Court of Arbitration considers that the obligation of the two Respondents concerning payment of the debt that they jointly contracted with ENERGOINVEST is a joint and several obligation.

Having established this, there is no need to analyze the subsidiary issue of the Respondent with regard to a possible simple partnership between the Government and the S.N.EL., which issue, at first glance, would appear to be rather doubtful.

## IX - REQUEST FOR PAYMENT OF INTEREST

137. In its conclusions, which are those in the Brief of June 28, 2002, upheld at the oral pleadings of December 10, 2002, the Claimant asked that the Respondents be jointly and severally ordered to pay the amount of US$18,430,555.54 as principal *"plus interest at the contractual rate of 8.75% from the due date of each installment until effective payment."*

It also asked the Respondents to be ordered to pay additional interest *"on amounts granted, at the corresponding interest rates."*

138. In that award, the Court of Arbitration has already affirmed the Claimant's right to payment of the sum of US$18,430,555.47, which is the result of the correction of a series of small errors made by the Claimant in its calculations (see paragraphs 93 to 95 of this award).

139. The Court of Arbitration also remarked that this sum is composed of two amounts of a different nature: the amount of US$18,073,746.94, which corresponds to all loan repayment maturities, principal and conventional interest, which are still unpaid, and the amount of US$356,808.53, which corresponds to penalty interest on payments made in arrears.

140. The first amount (US$18,073,746.94) corresponds to credit repayment maturities on a loan for which the parties had agreed to apply an interest rate of 8.75% per year. Since there is no conventional penalty in

case of payment in arrears, the same rate should thus apply to the period in arrears, calculated from each of the unpaid maturities on the respective amount.

141. In contrast, the second amount (US$356,808.53) is interest due following payments made in arrears. ENERGOINVEST had demanded payment of this sum in its letter of February 22, 1991, but its request was not honored.

Consequently, pursuant to the provisions of Article 105 of the CO, "*the debtor remains obligated for payment of interest . . . does not owe penalty interest until such time as proceedings are instituted or the matter is taken to court.*" Penalty interest is 5% per year, as established in Article 104 of the CO, and it must thus be paid on the sum in question from the date the Motion for Arbitration was introduced. Since the ICC received the Motion for Arbitration on March 4, 2001, the Court of Arbitration has decided that penalty interest shall be calculated as of that date.

## X – ARBITRATION EXPENSES

142. The Court of Arbitration is free to make a decision with regard to arbitration expenses (Article 31(3) of the Regulations).

143. Despite this discretionary power, which allows it to take into account an entire series of circumstances which, in the case in question, could justify an award of costs, thus departing from the principle of charging costs to the losing party, that principle is the one that is most often applied in arbitration proceedings involving international trade and is certainly the most logical, since the need for a party to have recourse to

arbitration proceedings in order to have its rights recognized should not constitute a penalty for said party as a result of the costs entailed by such proceedings.

144. In this arbitration, the Court sees no reason to depart from said principle.

145. Even if one could take into consideration the fact that several questions argued between the parties and which required a decision by the Court are the result of the poor drafting of the contracts, one should also consider that, on the one hand, both parties are equally responsible for such poor drafting and that, on the other, the real intention of the parties, which the Court was at times required to seek, was well-known to the parties themselves, which means that the defaulting party acted in bad faith with regard to certain aspects of its defense.

146. The DRC's nonparticipation in the arbitration proceedings, even though it had taken part in the negotiations that failed in September 2001 following the presentation of the Motion for Arbitration and just before the proceedings got underway, is in no way justified.

147. The S.N.EL.'s participation in the proceedings was late (which clearly caused them to be extended), and the numerous arguments it presented in its defense were, in the end, found by the Court to be groundless.

148. As has already been mentioned, the Court is not interested in the possible political or economic problems of the DRC (which it deeply regrets), just as it is not interested in the damage sustained by ENERGOINVEST as a result of the well-known political events in Bosnia-Herzegovina (which it equally regrets). It is interested in an

international trade agreement with which one of the parties, it appears, failed to comply. No one is challenging ENERGOINVEST's claim in this matter, but apparently no one wants to pay it: neither the government, which was absent from the arbitration proceedings, nor S.N.EL., which participated in them only to assert, without grounds, that it was not a debtor. Nor has anyone contested the fact that the project that was financed and carried out by ENERGOINVEST was financed and carried out to the complete satisfaction of the DRC and the S.N.EL., who, for more than ten years, have benefited from the project in question.

149. For these reasons, the Court of Arbitration rules that the arbitration expenses shall be paid in full by the two Respondents, jointly and severally.

These expenses include:

- o   the arbiters' fees and expenses established by the Court in the amount of US$215,880.00
- o   administrative costs totaling US$25,000.00
- o   fees and expenses related to ENERGOINVEST's defense in the amount requested of US$168,000.00, which the Court of Arbitration considers appropriate and justified

For all of the above reasons

### THE COURT OF ARBITRATION UNANIMOUSLY RULES

1.  The Court of Arbitration has jurisdiction over the Democratic Republic of the Congo (Respondent No. 1) and over the S.N.EL. (Respondent No. 2).

2.  The two Respondents are jointly and severally ordered to pay to the Claimant the sum of US$18,430,555.47.

3.  The two Respondents are jointly and severally ordered to pay interest to the Claimant as follows:
    o   interest at an annual rate of 8.75% on the sum of US$18,073,746.94, to be calculated based on the amount of each overdue installment payment included in said sum, starting on the respective due date and up to the date of full payment;
    o   interest at an annual rate of 5% on the sum of US$356,808.53, starting on March 4, 2001 (date on which the Motion for Arbitration was presented) and up to the date of full payment.

4.  The two Respondents are jointly and severally ordered to pay the arbitration expenses, as follows:
    o   US$25,000.00 for the Court's administrative costs;
    o   US$215,880.00 for the Arbiters' fees and expenses;
    o   US$168,000.00 as repayment of the expenses related to the Claimant's defense.

Place of arbitration: Paris                                    April 30, 2003

**THE COURT OF ARBITRATION**

Attorney Renato Roncaglia, Presiding Judge        [signature]
Dr. Marc Ronca, Co-Arbiter                        [signature]
Dr. Mohamed T. Abu-Samra, Co-Arbiter              [signature]